LEONARD LaBIENIEC *v.* GERALD BAKER ET AL.
(4296)

DUPONT, C. J., HULL and DALY, Js.

Argued February 10—decision released June 9, 1987

*F. Timothy McNamara,* for the appellant (plaintiff).

*Francis H. Morrison III,* with whom, on the brief, was *Daniel L. FitzMaurice,* for the appellee (named defendant).

*James T. Graham,* with whom, on the brief, was *D. William White,* for the appellee (defendant Robert Langmann).

DALY, J. This is a medical malpractice action brought by the decedent plaintiff[1] against Gerald Baker, a radiologist, and Robert Langmann, an internist, both of

---

[1] Barbara N. LaBieniec, wife of the named plaintiff who died on October 9, 1986, was named executrix of his estate and was substituted as a party plaintiff. The term plaintiff as used in this opinion will refer to the decedent.

whom failed to detect lung cancer in x-rays taken of the plaintiff during the course of a physical examination. In his complaint, the plaintiff alleged that the defendants' failure to diagnose his lung cancer allowed the cancer to spread and grow (metastasize) to his brain. He further claimed that the delay caused him emotional distress and a decreased chance of survival.

At the close of the plaintiff's case, the trial court directed a verdict for each of the defendants because there was insufficient evidence to establish that the oversight of the defendants was the proximate cause of any injury to the plaintiff. The plaintiff's motion to set aside the verdict was denied. The basic issues in this appeal are whether the trial court erred (1) in concluding that expert medical testimony was required in order for the jury to consider the plaintiff's claim of emotional distress and (2) in finding insufficient evidence to allow the case to go to the jury. We find no error.

The trial court found the following facts. On or about June 1, 1981, the plaintiff underwent a routine physical examination by Langmann. Chest x-rays were taken. Because the plaintiff did not properly fit the x-ray equipment and because the x-ray revealed an area of questionable haziness, the plaintiff was referred to Baker for further x-rays. Langmann informed Baker that the plaintiff had been, up until five years previously, a four to five pack a day cigarette smoker, but failed to mention the shadow on the x-ray. On or about June 10, 1981, Baker informed Langmann that the x-ray he took of the plaintiff was essentially negative. Langmann so informed the plaintiff.

On or about July 1, 1981, the plaintiff collapsed and was taken to Hartford Hospital where additional x-rays were taken. As a result, a biopsy was performed which indicated carcinoma of the lung. After a CAT scan, the

plaintiff was also diagnosed as having an abnormal area of the brain. By mid-August this brain lesion was recognized as a metastasis from the lung cancer. The plaintiff underwent radiation treatment of both the lung and the brain.

While directed verdicts are not favored, they are justified if the evidence itself would require the jury, when acting reasonably and logically, to reach the conclusion embodied in the directed verdict. When reviewing the action of a trial court in directing a verdict and in refusing to set it aside, we must view the evidence in the light most favorable to the plaintiff. *Boehm* v. *Kish,* 201 Conn. 385, 388, 517 A.2d 624 (1986); *Morales* v. *Trinity Ambulance Service,* 9 Conn. App. 386, 388, 519 A.2d 90 (1986), cert. dismissed, 202 Conn. 806, 520 A.2d 1287 (1987).

It is a generally recognized rule in malpractice cases that a plaintiff must plead and prove not only that injury occurred and that the defendant was negligent, but also that the defendant's negligence *caused* the injury. *Katsetos* v. *Nolan,* 170 Conn. 637, 654–55, 368 A.2d 172 (1976); *Green* v. *Stone,* 119 Conn. 300, 306, 176 A. 123 (1934); 61 Am. Jur. 2d, Physicians, Surgeons and other Healers § 329; annot., 13 A.L.R.2d 21; see *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 340–42, 430 A.2d 1 (1980).

Medical malpractice actions involving diagnosis of cancer differ from other malpractice actions only factually. The legal analysis and elements remain the same. There are four essential elements to a malpractice action. They are: (1) the defendant must have a duty to conform to a particular standard of conduct for the plaintiff's protection; (2) the defendant must have failed to measure up to that standard; (3) the plaintiff must suffer actual injury; and (4) the defendant's con-

duct must be the cause of the plaintiff's injury. D. Wright & J. Fitzgerald, Torts § 88; 79 A.L.R.3d 915, 921; see *Shelnitz* v. *Greenberg,* 200 Conn. 58, 65, 509 A.2d 1023 (1986); *Pisel* v. *Stamford Hospital,* supra, 334; *Shenefield* v. *Greenwich Hospital Assn.,* 10 Conn. App. 239, 248, 522 A.2d 829 (1987).

Thus, to be entitled to damages, the plaintiff must establish on the basis of reasonable medical probability the "necessary causal relation" between the failure of the defendants to diagnose the lung cancer and the injury the plaintiff claims to have suffered. See *Shelnitz* v. *Greenberg,* supra, 65–66, and cases cited therein; see generally *Cross* v. *Huttenlocher,* 185 Conn. 390, 394–95, 440 A.2d 952 (1981). This connection can not rest upon speculation or conjecture. *Shelnitz* v. *Greenberg,* supra, 66; *Healy* v. *White,* 173 Conn. 438, 443, 378 A.2d 540 (1977); *Sheiman* v. *Sheiman,* 143 Conn. 222, 225, 121 A.2d 285 (1956).

If a plaintiff is proximately harmed by a delay in a definitive diagnosis, a physician may be held liable. *Schaecher* v. *Reinwein,* 41 Ill. App. 3d 1055, 1058, 355 N.E.2d 351 (1976). In this case, the trial court found that "the evidence establishes malpractice on the part of each defendant in misreading the lung x-rays and the resultant delayed diagnosis of lung cancer. The core problem presented by the evidence, and lack of evidence, relates to the issue of causation." Thus, we are concerned not with the issue of negligence, but whether the alleged malpractice was the proximate cause of any injury.

I

The plaintiff claims that the court erred in requiring expert medical testimony to prove mental distress. Underlying this claim is the plaintiff's assertion that the delay in diagnosing his cancer, and not the cancer itself, caused his mental anguish. The plaintiff asserted

that his distress stemmed from his belief that, had he been diagnosed sooner, the cancer would not have metastasized to his brain, that his prognosis would have been better and that the outcome would have been different.

The plaintiff is correct that expert testimony is not required to prevail on a claim of mental suffering. Our Supreme Court has held that "[a] plaintiff may recover damages in a personal injury action for pain and suffering even when such pain and suffering is evidenced exclusively by the plaintiff's subjective complaints. *Hook* v. *Dubuque,* 153 Conn. 113, 115, 214 A.2d 376 (1965)." *Delott* v. *Roraback,* 179 Conn. 406, 409, 426 A.2d 791 (1980). This court has stated that " '[w]e see no reason to subject a claim of mental suffering, which is ordinarily evidenced by subjective complaints, to a stricter scrutiny or greater care than a claim of physical suffering evidenced by the same type of complaints.' . . . A plaintiff need only establish a claim for mental or emotional distress by a fair preponderance of the evidence . . . ." *Buckley* v. *Lovallo,* 2 Conn. App. 579, 589, 481 A.2d 1286 (1984). We agree that the plaintiff can prove the existence of mental distress without expert testimony. We note, however, that the plaintiff was required to prove his claim by a "fair preponderance" of the evidence. For the reasons set out in section II, we find that the trial court's error in requiring expert testimony on this claim was harmless.

## II

The second issue in this case is whether the trial court erred in concluding that there was insufficient evidence to allow the case to go to the jury. This issue has two parts, one relating to the claim of emotional distress, and the other relating to the claim of a decreased chance for successful treatment.

## A

The trial court was correct in directing a verdict for the defendants on the claim of emotional distress. While it is possible that the plaintiff could have shown emotional distress without expert testimony, he failed to submit sufficient evidence of the proximate cause of the distress to allow the claim to go to the jury. The court found that the plaintiff's belief that the delay in diagnosis detrimentally affected his prognosis was mistaken and was essentially unsupported by the evidence. Moreover, he failed to demonstrate that the delay and not the cancer itself caused the claimed emotional distress. In building a case for malpractice in general, the plaintiff called his treating oncologist, Robert S. Martin. On cross-examination, Martin testified that the cancer itself was the cause of the plaintiff's emotional distress.[2]

The only evidence that the *delay and not the cancer* was the cause of the emotional distress was testimony by the plaintiff.[3] Aside from these statements, the remainder of the plaintiff's testimony on mental dis-

---

[2] Martin's testimony included the following: "I think that my patient had a good deal of difficulty from the time this was diagnosed, as I think anybody would, with a lung cancer which is a rather threatening thing to have. And, that led to a whole lot of other changes in his life, which were also difficult for him to tolerate. And, the combination of all these, I think makes it understandable that he is depressed and having difficulty coping with all of these changes."

Further when asked "is it fair to say that you understand the problems he is having to arise from his difficulty coping with the cancer, as opposed to arising from any delay in the diagnosis of the cancer?" Martin replied: "I think it's coping with the cancer and the effects of treatment and all of the things that changed his life as a result of these events."

[3] "[I] felt if I had been told that I had some kind of funny spot on my lung when I had that [first] exam, I would have insisted on following up to find out what the thing was. I feel that we would have had that lung operation at that time and it would have never—the metastasis would never

tress really addressed his feelings about the disease itself rather than the delay. His wife testified that the plaintiff "thought that . . . if they had done work on him June 1 rather than waiting . . . he would still be working and maybe it wouldn't have metastasized as far up the brain as it did." Yet, she also testified, in general, that "he's not coping well at all" with his disease. Although not required, " 'medical science has unquestionably become sophisticated enough to provide reliable and accurate evidence on the *causes* of mental trauma.' *Culbert* v. *Sampson's Supermarkets, Inc.,* 444 A.2d 433, 436 (Me. 1982)." (Emphasis added.) *Buckley* v. *Lovallo,* supra, 589. A claim of physical suffering can go to the jury only if the plaintiff produces sufficient evidence of the suffering and that the malpractice, within reasonable medical probability, was more likely than not the cause of the physical suffering. The same holds true for an emotional distress claim; a plaintiff must provide sufficient evidence of the distress and that the malpractice, within reasonable medical probability, was more likely than not the cause of the distress. In this case, the plaintiff did not prove causation. The jury therefore could not have found for him on this claim and it was proper for the trial court to direct a verdict. No matter how negligent a party may be, if his act bears no causal relation to the injury, it is not actionable. *Kirby* v. *Spivey,* 167 Ga. App. 751, 756, 307 S.E.2d 538 (1983). Since the plaintiff failed to establish the existence of emotional distress caused by the delay, rather than by the disease, the trial court did not err in directing a verdict on the emotional distress claim.

---

have happened . . . . That if I had been told that I had something on that lung at that examination, that I would have insisted on a biopsy to find out whatever it is. And that I would have had that operation and that I would be working today. It would have never went to the brain and that's what bothers me."

## B

The plaintiff also claimed that the delay in diagnosis prevented the early removal of his lung or earlier treatment which decreased his chance for successful treatment. To prevail on this claim, a plaintiff must show (1) that he has in fact been deprived of a chance for successful treatment and (2) that the decreased chance for successful treatment *more likely than not* resulted from the defendant's negligence. *Gooding* v. *University Hospital Building, Inc.*, 445 So. 2d 1015, 1020 (Fla. 1984). "In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome." Id.

We find that the plaintiff failed to adduce evidence that he in fact suffered a decreased chance for successful treatment. Martin testified that the metastasis occurred sometime prior to July 1, and that "the chances are probably very good that it was there" in early June, 1981. Frederic Krauft, a treating radiologist, also testified that the brain lesion was present in early June 1981. Simon Berger, the plaintiff's radiology expert, testified that metastasis occurred sometime during the month of June. Berger did not testify, however, that treatment following an earlier diagnosis could have prevented metastasis or increased the chance for successful treatment. Thus, there was no evidence for the jury to consider in support of the plaintiff's belief that an earlier diagnosis would have affected the course of treatment, or the course of the disease. "[A]nxiety about a completely fictitious or imagined consequence, having no reasonable basis, is not a recoverable element." Annot., 71 A.L.R.2d 338, 342 (1960).

The plaintiff in this case failed to show that the delay in diagnosis caused him any injury. "The loss of a

speculative chance of recovery alone is not an injury from which damages flow. We are convinced that the better rule to follow is the one which requires the plaintiff to prove that the defendants' negligence in all probability, proximately caused the injury. Only by such proof will the plaintiff have proven proximate cause." *Cooper* v. *Sisters of Charity of Cincinatti, Inc.*, 27 Ohio St. 242, 252, 272 N.E.2d 97 (1971); *Kirby* v. *Spivey*, supra, 756; *Mortensen* v. *Memorial Hospital*, 105 App. Div. 2d 151, 157, 483 N.Y.S.2d 264 (1984); *Hanselman* v. *McCardle*, 27 S.C. 46, 48–49, 267 S.E.2d 531 (1980). "When dealing with death admittedly directly caused by cancer the jury cannot speculate on other causes that *might* have contributed to such death." (Emphasis in original.) *Grody* v. *Tulin*, 170 Conn. 443, 450, 365 A.2d 1076 (1976). In *Grody*, the Supreme Court upheld the trial court's directed verdict because the plaintiff failed to show that the defendant's negligence, in all probability, caused the plaintiff any injury. The plaintiff in that case, as in this, failed to prove the injury, and therefore could not prove causation.

" 'If the chain of causation . . . when traced from the beginning to the end, includes an act or omission which, even if wrongful or negligent, is or becomes of no consequence in the results or is so trivial as to be a mere incident of the operating cause, it is not such a factor as will impose liability for those results.' " *Grody* v. *Tulin*, supra, 448–49. Thus, if the failure to diagnose was of no consequence to, or was a mere incident to the course of the plaintiff's treatment, such failure does not impose liability on the defendants. In analyzing whether the failure to diagnose was of consequence or was no more than an incidental factor, the trial court is to concern itself with reasonable probabilities and not possibilities. *Budney* v. *Zalot*, 168 Conn. 388, 388–89, 362 A.2d 861 (1975); *Doyle* v. *Bussell*, 5 Conn. App. 480, 482, 499 A.2d 1169 (1985).

Martin, when asked if he thought the metastasis in the brain had occurred by June 1, 1981, replied, "the chances are probably very good that it was there at that time." He further testified that "this particular cancer . . . was a very slow growing tumor. And, probably the spread in the brain was growing at about the same rate as the spread in the lung, and the lung tumor had to occur before the spread to the brain happened, so that the whole thing probably happened sometime before one could even see it on an x-ray and before it grew large enough to be able to be picked up. And, probably the brain spread was there for quite some time . . . . " Martin also testified that he did not think the plaintiff's outcome would have been any different if the lung cancer had been detected in early June.[4] Krauft testified in a similar fashion.[5] Berger testified for the

---

[4] During cross-examination, Martin testified as follows:

"Q: Do you think that if the lung cancer had been detected or suspected on June 10, 1981, as opposed to July 2nd, do you think that his outcome would be any different today from what you have just told me?

A: No. No, probably not."

[5] The testimony of Krauft included the following:

"Q: All right. Now Doctor, in terms of yourself as a treating physician for Mr. LaBieniec, was the fact that the abnormality in the lung, the x-ray, was not interpreted on June 10, 1981 in that x-ray but was not interpreted until July of 1981, later, did that have any consequence in your view as a treating physician in the treatment—the course of treatment that you and your collegues decided upon for him?

"A: No.

"Q: All right . . . . Let's assume that the abnormality was interpreted, was picked up on the June 10, 1981 x-ray instead of the July 1, 1981 x-ray, okay. In your view as a treating physician, did that have any impact at all, any material impact on Mr. LaBieniec's outcome as a patient?

"A: No.

"Q: In other words, Doctor, from your point of view, to the extent that you know of his care and treatment and to the extent that you saw him, he was not any different or any worse off because of the fact that that abnormality was not picked up on June 10 but was picked up on July 1?

"A: No, and the reason I say that is because I feel professionally he had the tumor in his brain at that time in June.

"Q: And Doctor, what you're telling the ladies and gentlemen is that you feel that the brain tumor was present in his brain as of June 10, 1981?

plaintiff that metastasis "occurred after that early June examination and before the one which was made in July . . . ." Berger did not testify however, as to whether the failure to diagnose had any impact on the plaintiff's treatment or outcome.

In this case, the evidence failed to remove the decreased chance of successful treatment theory from the realm of speculation. See *Sochard* v. *St. Vincent's Medical Center,* 8 Conn. App. 6, 10–11, 510 A.2d 1367 (1986). In fact, two expert witnesses specifically testified that the delay in diagnosis made no difference whatsoever, that is, the plaintiff's chance at successful treatment had not, in fact, decreased. On this basis, the trial court concluded that the plaintiff failed to establish that the defendants' alleged malpractice was the proximate cause of any decrease in his opportunity for successful treatment.

Since there was no evidence which could have led the jury to a reasonable inference that the defendants' acts of malpractice were the direct and proximate cause of a decrease in the chance of successful treatment, it was proper for the trial court to direct a verdict on this issue.

On the basis of our review of the record, the transcripts, and the evidence in this case, we conclude that the trial court did not err in directing a verdict for the

"A: Yes.

"Q: And Doctor, is that opinion based upon your experience and your training and your practice in your field as a lung doctor over the years?

"A: Yes. It's not unique to being a lung physician. I would say it's unique to being a physician and what I understand about cancer and how it behaves.

"Q: And Doctor, is what you have just told us, the fact that not picking up or interpreting that abnormality on June 10 but picking it up on July 1, that that didn't have any impact either on Mr. LaBieniec's treatment or on his outcome, is that something that you told him at any time?

"A: Yes."

defendants and in denying the plaintiff's motion to set aside the verdict.

There is no error.

In this opinion the other judges concurred.