RONDA DREW, ADMINISTRATRIX (ESTATE OF CASSIDY DREW-ANZALONE) ET AL. *v.* WILLIAM W. BACKUS HOSPITAL ET AL.
(AC 22986)

Foti, West and Dupont, Js.

Argued March 26—officially released July 1, 2003

*Robert E. Healey*, for the appellants (plaintiffs).

*Jeffrey F. Buebendorf*, for the appellee (named defendant).

*Thomas W. Boyce, Jr.*, with whom, on the brief, was *Jennifer Antognini-O'Neill*, for the appellee (defendant Joseph A. Newell).

*Opinion*

FOTI, J. This appeal arises from a medical malpractice action. The plaintiffs, Ronda Drew, both individually and in her capacity as the administratrix of the estate of Cassidy Drew-Anzalone, and Michael Anzalone, appeal from the judgment of the trial court rendered in favor of the defendants, William W. Backus Hospital (hospital) and Joseph A. Newell. The judgment followed the court's action in granting summary judgment in the defendants' favor on all counts of the plaintiffs' operative complaint. On appeal, the plaintiffs challenge the propriety of the court's ruling. The dispositive issue raised by the plaintiffs is whether the court, in the context of their malpractice claim, properly concluded that no genuine issue of material fact existed and that, as a matter of law, they had failed to demonstrate that the defendants caused the injury alleged by the plaintiffs. The plaintiffs also claim that the court improperly granted summary judgment with respect to their claims sounding in bystander emotional distress. We affirm the judgment of the trial court.

The material facts underlying this appeal are not in dispute. In the early afternoon of July 26, 1997, sixteen month old Cassidy Drew-Anzalone, the daughter of plaintiffs Ronda Drew and Michael Anzalone, was brought to the hospital's emergency room where doctors and medical personnel on the hospital's staff administered medical treatment to her. The child was taken to the hospital because she had been vomiting, had a fever, was irritable and appeared to be in pain. At all relevant times, Newell was a licensed physician specializing in the area of pediatric medicine, was on the hospital's staff and possessed admitting privileges to the hospital. One to two hours after the child arrived in the emergency room, Newell examined and assumed responsibility for the child's care as her attending physician. Newell caused the child to be admitted to a pediatric floor of the hospital; he preliminarily diagnosed her to be suffering from gastroenteritis. At or about 10:20 p.m., the child suffered cardiopulmonary arrest. For the next hour and twenty minutes, Newell and hospital staff members attempted to restore the child's cardiopulmonary viability. Their efforts were unsuccessful and, at 11:35 p.m., Newell pronounced the child dead. It was later determined that the child had died from an undiagnosed disease that affects heart tissue, known as lymphocytic myocarditis.

In their operative complaint, the plaintiffs alleged that in a number of ways, Newell and the hospital breached the standard of care that they owed to the child. They claimed that Newell was deficient in the quality and frequency of care that he administered to the child. Further, they alleged that Newell breached the duty of care that he owed the child while he was acting within the scope of his apparent authority for the hospital. The plaintiffs also alleged that the hospital breached the standard of care that it owed the child in that the care it provided to the child via its nurse

employees was deficient. The plaintiffs Ronda Drew, individually, and Michael Anzalone also alleged that the defendants' negligent course of conduct in the care of their daughter caused them extreme emotional distress.

The plaintiffs' operative complaint consisted of six counts. Counts one and two, which sounded in medical malpractice and wrongful death, are alleged by Ronda Drew, in her capacity as administratrix, against Newell and the hospital, respectively. Counts three through six are claims, sounding in bystander emotional distress, brought by Ronda Drew and Michael Anzalone against Newell and the hospital.

The defendants filed motions for summary judgment. The plaintiffs explained clearly the legal basis for their claims in their opposition to the defendants' motions for summary judgment. The plaintiffs did not allege that Newell violated the duty of care he owed the child by failing to properly diagnose her as suffering from lymphocytic myocarditis. Rather, the gravamen of the plaintiffs' claim was that on the basis of symptoms being exhibited by the child while she was under Newell's care, symptoms which he should have better monitored and investigated, the standard of care required Newell to transfer the child to a "pediatric intensive care and/or tertiary care center several hours before" she experienced cardiopulmonary arrest. Further, the plaintiffs claimed that the evidence demonstrated that if Newell had transferred the child "to a tertiary care center at 5 or 6 o'clock on the day of her admission (approximately three hours or more after her initial arrival at [the hospital] and four to five hours before her cardiopulmonary arrest)," the child would have had a "very good chance of surviving . . . ."

The plaintiffs based their allegation of medical malpractice on a theory of lost chance of survival. The plaintiffs claimed that the defendants breached the duty

of care by not providing the child with adequate supportive care, as her medical condition warranted, and that this negligent conduct caused a decreased chance of survival and, ultimately, her death. In support of their claim that the alleged breach of the standard of care caused the injury of which they complain, the plaintiffs submitted deposition testimony and an affidavit from Robert J. Sommer, a physician specializing in pediatric cardiology.

In support of their motions for summary judgment, the defendants argued that the plaintiffs had failed to set forth an evidentiary basis to support their claim that the defendants' alleged negligence caused the child to suffer a lost chance of survival. The defendants argued, essentially, that viewing the plaintiffs' proffered evidence in the light most favorable to the plaintiffs' case, such evidence did not, as a matter of law, support the causal link between the alleged negligent acts and a decreased chance of survival that the plaintiffs bore the burden of proving. The defendants also argued that the plaintiffs' claims, which sounded in bystander emotional distress, were derivative of the plaintiffs' malpractice claims. The defendants argued that they were entitled to judgment on those claims as a matter of law because they were entitled to judgment as a matter of law on the malpractice claims. Alternatively, the defendants argued that they were entitled to judgment as a matter of law on the claims sounding in bystander emotional distress because Connecticut law does not recognize such claims when they are based on medical malpractice.

The court concluded that as a matter of law, the plaintiffs had failed to demonstrate the essential element of causation. Accordingly, the court granted the defendants' motions for summary judgment with respect to the medical malpractice counts. The court further concluded that the bystander emotional distress

claims of the plaintiffs Ronda Drew and Michael Anzalone were derivative of the malpractice claims and rendered judgment in the defendants' favor on those claims, solely on that basis, as well.

Before turning to the plaintiffs' claims, we first set forth our well settled standard of review. "[T]he scope of our review of the granting of a motion for summary judgment is plenary. . . . In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Golden* v. *Johnson Memorial Hospital, Inc.*, 66 Conn. App. 518, 522–23, 785 A.2d 234, cert. denied, 259 Conn. 902, 789 A.2d 990 (2001). In ruling on a motion for summary judgment, it is customary for the court to review documentary proof submitted by the parties to demonstrate the existence or nonexistence of issues of material fact. Practice Book § 17-45.

Practice Book § 17-49 provides in relevant part: "[J]udgment . . . shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of

a genuine issue of material fact." (Citations omitted; internal quotation marks omitted.) *Gaynor* v. *Payne*, 261 Conn. 585, 590–91, 804 A.2d 170 (2002). "The test is whether a party would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) *Golden* v. *Johnson Memorial Hospital, Inc.*, supra, 66 Conn. App. 523. Insofar as the court's legal conclusions are challenged, we must determine whether they are legally and logically correct and find support in the facts contained in the court's memorandum of decision. *Zachs* v. *Groppo*, 207 Conn. 683, 689, 542 A.2d 1145 (1988).

I

The plaintiffs first claim that the court improperly concluded, with regard to their malpractice claim, that no genuine issue of material fact existed as to the child's chance of survival and that, as a matter of law, the defendants were entitled to judgment in their favor. We disagree.

"[P]rofessional negligence or malpractice . . . [is] defined as the *failure of one rendering professional services* to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. . . . [M]alpractice presupposes some improper conduct in the treatment or operative skill [or] . . . the failure to exercise requisite medical skill . . . . [T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254–55, 811 A.2d 1266 (2002).

The general rule regarding causation in medical malpractice cases is clear. "All medical malpractice claims, whether involving acts or inactions of a defendant physician, require that a defendant physician's conduct proximately cause the plaintiff's injuries. The question is whether the conduct of the defendant was a substantial factor in causing the plaintiff's injury. Expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." (Internal quotation marks omitted.) *Poulin* v. *Yasner*, 64 Conn. App. 730, 738, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001); see also *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130–31, 540 A.2d 666 (1988) (plaintiff required to show that defendant's actions or omissions were substantial factor in producing injuries complained of).

The causation requirement, in the context of the present claim of malpractice, requires further discussion. Here, the plaintiffs do not merely claim that the defendants caused the child to suffer harm. The plaintiffs claim that the victim, suffering from disease, sought care from the defendants and that their negligent care deprived the victim of a likelihood of survival. Proving causation in such a case is difficult because the result complained of, in this case death, might normally be expected to follow from the victim's disease, rather than from mistreatment by the defendants. It has been stated that "[p]laintiffs in such cases are faced with the difficulty of obtaining and presenting expert testimony that if proper treatment had been given, better results would have followed." Annot., 54 A.L.R.4th 17, § 2 [a] (1987).

"In a loss of chance case, a tortfeasor, through his negligence, causes an individual to lose a chance to avoid some form of physical harm. . . . The traditional

standard of the sufficiency of the evidence for submitting a medical malpractice case to the jury has required a plaintiff to adduce evidence of a reasonable medical probability that his injuries were proximately caused by the negligence of one or more of the defendants. This meant demonstrating that it is more likely than not that the injury, harm or condition claimed to have resulted from that negligence, was a substantial factor in causing the injury, harm or condition and without which that injury, harm or condition would not have occurred. . . . Where a preexisting condition is involved, a loss of chance plaintiff, in order to meet the traditional standard of causation, must prove that the victim of the alleged negligence probably would have survived had he been treated properly. If, however, the victim probably would not have survived, the cause of his death, if he died, would not have been the defendant's alleged negligence, but the preexisting condition. So, to satisfy this traditional standard, the plaintiff must prove that prior to the defendant's alleged negligence, the victim had a chance of survival of at least 51 percent." (Citations omitted; internal quotation marks omitted.) *Borkowski* v. *Sacheti*, 43 Conn. App. 294, 301, 682 A.2d 1095, cert. denied, 239 Conn. 945, 686 A.2d 120 (1996).

This court recognized the existence of the "lost chance doctrine" in *LaBieniec* v. *Baker*, 11 Conn. App. 199, 526 A.2d 1341 (1987). In doing so, it adopted the so-called "traditional approach," as previously described, for demonstrating causation.[1] The estate of

---

[1] That traditional approach for proving causation requires that a plaintiff prove that with proper medical treatment, the patient *probably* would have avoided the *injury, harm or condition* complained of. To put that approach in some context, a brief discussion of alternative approaches to proving causation in lost chance cases is provided as follows.

The "relaxed causation" or "substantial chance" approach requires a plaintiff to prove that "a substantial or significant chance of survival or better recovery was lost. If plaintiff meets this initial threshold, the causation issue is submitted to the jury, using the tradition proximate cause standard to ascertain whether, in fact, the alleged malpractice resulted in the loss of a

the decedent plaintiff in *LaBieniec* brought an action against the defendant radiologist. The plaintiff alleged that the defendant negligently failed to diagnose the decedent's lung cancer when he should have and that this failure caused the cancer to grow and spread, thereby decreasing the decedent's chances for survival. Id., 201. This court stated that the plaintiff, to prevail on her claim that the defendant's negligent acts decreased the decedent's chance for successful treatment, "must show (1) that [the decedent had] in fact been deprived of a chance for successful treatment and (2) that the decreased chance for successful treatment *more likely than not* resulted from the defendant's negligence. . . . In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 207. The court stated that the plaintiff was required to prove that "the [defendant's] negligence in all probability, proximately caused the injury." (Internal quotation marks omitted.) Id., 208.

This court affirmed the trial court's decision to grant a directed verdict in the defendant's favor on the lost

substantial or significant chance. Thus, the jury must find by a preponderance of the evidence that the alleged negligence was the proximate cause of the lost chance, but the lost chance itself need only be a substantial or significant chance, for a better result, absent any malpractice, rather than a greater than 50 percent chance of a better result." (Internal quotation marks omitted.) *Borkowski* v. *Sacheti*, supra, 43 Conn. App. 302–303.

Under the "proportional" approach to causation in such cases, the loss of chance is viewed and redressed "in its own right." (Internal quotation marks omitted.) Id., 305. "Instead of attempting to determine whether the physical harm was caused by negligence, a court could examine the extent of the victim's lost chances for cure or improvement and grant a recovery that mirrors the extent of those chances. . . . The relevant inquiry would be whether the defendant 'probably' caused a reduction in the victim's chances. If causation were found, the court would provide compensation for the lost chance in direct proportion to the extent of the lost chance." (Internal quotation marks omitted.) Id., 304.

chance claim. The court noted that the plaintiff had failed to adduce any evidence in support of her belief that an earlier diagnosis would have affected either the course of treatment or the spread of the decedent's cancer. The court observed that the plaintiff had "failed to remove the decreased chance of successful treatment theory from the realm of speculation." Id., 210.

In *Borkowski* v. *Sacheti*, supra, 43 Conn. App. 312–15, this court held that it was reversible error for a trial court, without having considered the evidentiary basis of such claim, to refuse to submit a lost chance claim to the jury. The court held that *LaBieniec* enunciated the proper elements necessary to prove a lost chance claim and stated that a plaintiff, to prove his or her entitlement to recovery, must demonstrate lost chance in terms of probability, not possibility. Id., 311.

In *Wallace* v. *St. Francis Hospital & Medical Center*, 44 Conn. App. 257, 688 A.2d 352 (1997), this court reaffirmed its earlier decisions in *LaBieniec* and *Borkowski*, which applied the traditional approach to causation in loss of chance cases. The plaintiff in *Wallace*, the administratrix of the decedent's estate, brought a malpractice action against the defendant hospital. The plaintiff alleged that the defendant negligently caused her decedent to lose his chance of survival. The decedent died from a massive intraperitoneal hemorrhage while under the care of the hospital's emergency department. Id., 258–59. The court granted the defendant's motion for a directed verdict after concluding that the plaintiff failed to prove that the defendant's acts or omissions either led or contributed to the decedent's death. Id., 258.

On appeal, the plaintiff claimed, inter alia, that the court improperly granted the motion for a directed verdict in the defendant's favor because she had produced sufficient evidence to prove that the acts or omissions

complained of in the treatment of the decedent, namely, the defendant's failure to perform surgery on the decedent, caused a lost chance for survival. This court affirmed the trial court's decision, concluding that the plaintiff had, in fact, failed to demonstrate the causal link necessary to prove her case.

This court explained: "The plaintiff in the present case, as did the plaintiff in *LaBieniec*, failed to produce sufficient evidence that the decedent had a better than even chance for survival if brought to surgery. At trial, [the plaintiff's expert witness] was asked by the plaintiff's counsel, 'Do we know, with any certainty, whether surgery would have been successful on [the decedent]?' To this question, [the plaintiff's expert witness] replied, 'No.' The plaintiff's counsel then asked, '[H]e could have died in the operating room?' [The plaintiff's expert witness] replied, 'Yes.' Furthermore, the plaintiff did not offer any evidence pertaining to either the cause or source of the decedent's internal bleeding.

"The jury was left without any evidence to show that the decedent would have had a better than even chance at survival if the defendant's employees had brought him to surgery. The plaintiff's contention that the decedent lost a chance of survival due to the defendant's alleged negligence is based on speculation and not on the reasonable probability that *LaBieniec* requires. We conclude that the trial court properly granted the defendant's motion for a directed verdict because the plaintiff offered no evidence that the defendant's alleged negligence was the proximate cause of the decedent's injury." Id., 264.

At issue in this appeal is not whether the plaintiffs properly supported their allegations that the defendants breached the duty of care that they owed to the child, but whether the court properly concluded that the defendants had demonstrated that no genuine issue of

material fact existed as to whether those alleged acts of malpractice proximately caused the child to suffer a decreased chance of survival and proximately caused her death. Mindful of the foregoing legal principles on which that claim rests, we turn now to the evidence related to the issue of causation that the plaintiffs submitted to the court in support of their complaint.

The plaintiffs' evidence as to causation came in the form of deposition testimony and an affidavit from Sommer.[2] Sommer testified that children with lymphocytic myocarditis fall into three categories: One third die from the disease, one third recover and do not experience health complications, and one third recover and experience long term health complications. Sommer testified, however, that it was his opinion that it was "impossible to predict" into which of these three categories a patient will fall.

Sommer later testified that given improvements in treatment and in intensive care, some studies indicate that young children with lympocytic myocarditis have a 75 percent chance of surviving and making a complete recovery. Sommer testified that there was no way of knowing whether a particular child "would fit" into the 25 percent of children who did not survive. When asked about prognosticating factors to determine the child's chances for survival, Sommer testified that "[t]here is no way to prognosticate, especially since they didn't know she had viral myocarditis."[3] Sommer stated, how-

[2] The record contains only the portions of Sommer's testimony that the parties appended to their memoranda. The plaintiffs did not provide the trial court with Sommer's deposition testimony in its entirety.

[3] Despite testifying that he knew of no way to "prognosticate" as to whether the child had a better than average chance of survival, Sommer also testified that "[p]atients who are shown on biopsy to have a lymphocytic infiltrate . . . will have a much better prognosis as a group because typically, especially in children who are young, a large percentage of those patients recover and many of them recover completely." Sommer did not testify, however, that such a condition existed with regard to the child and did not base his opinion on such a condition. Nonetheless, in their reply brief to this court, the plaintiffs represent that Steve Evans-Downing, a

ever, that he was "not critical at all" of the fact that the defendants failed to properly diagnose the child's condition.

After discussing further studies concerning children who fully recover from the disease and proceed to lead "very normal lifestyles," Sommer was asked a series of questions concerning the child in this case:

"Q. And are you in a position to express an opinion to a reasonable degree of medical probability that if this child had been transferred, say, at five or six o'clock on the day of her admission, to a tertiary care center that she would have lived?

"A. I can't say that definitively, but with a reasonable degree of certainty, she had a very good chance of surviving.

"Q. What does a 'a very good chance' mean?

"A. Based on the literature that we have, two-thirds to three-quarters of the patients like her survive with adequate supportive care.

"Q. And there is no way, looking at her condition, to say that she had a greater or lesser prospect of survival than this total cohort of people?

pathologist, indicated in deposition testimony that on the basis of autopsy results, the child had lymphocytic infiltration in her heart tissue. The plaintiffs argue that the child, therefore, did in fact have a "very favorable" diagnosis. The plaintiffs presumably encourage us to share that view of the evidence. The plaintiffs attached, as exhibit G to their reply brief, a single page containing a portion of Evans-Downing's deposition testimony.

The plaintiffs did not make that argument before the trial court, either in their written memoranda in opposition to the defendants' motions or during oral argument before the trial court. On the basis of our review of the record, the plaintiffs did not even submit Evans-Downing's deposition testimony, in any part, to the trial court for its review. Furthermore, the plaintiffs have raised that issue concerning that evidence, which was not before the trial court, for the first time in their reply brief. Even were we to find merit in the plaintffs' argument, which we do not, we would nonetheless decline to entertain it for those reasons.

"A. Unfortunately, there is no way to predict.

"Q. The fact that she was not producing urine, the fact that she had fluid in her lungs, the fact that she was experiencing clinical symptoms, ischemic bowel, none of these things tell you?

"A. No. That just tells you the status of her heart at that time.

"Q. And the nature and extent of the lympocytic myocarditis on autopsy, that doesn't tell us anything about her prospect of survival?

"A. No."

Later in his deposition testimony, Sommer was asked about a letter sent to him by the plaintiffs' attorney in which the plaintiffs' attorney summarized Sommer's expert opinion regarding causation. Sommer also was asked about his written response to the observations of the plaintiffs' attorney contained in the letter. The following colloquy took place:

"Q. Page four of [the plaintiffs' attorney's] letter . . . says, 'I understand that based on your knowledge of and experience with myocarditis in children, it is your opinion that if Cassidy had received appropriate supportive care to reduce the load on her heart and myocardium in this fashion before she arrested on July 26, 1997, she would have had a 66 percent chance of surviving her illness.'

"Your comment is as follows:

"On page four, first paragraph, with respect to the use of survival statistics: 'The use of statistics here is misleading. For the entire population of patients presenting with myocarditis there is approximately a 66 percent survival. Such global statistics cannot be applied to any individual patient. In this case, high intensity intervention with intubation after low reduction

. . . inotropic support, even extra corporeal membrane oxygenation (ECMO) may have made no difference in the ultimate outcome. There is no way to know retrospectively and, unfortunately, no way to know prospectively before undertaking such a course of treatment. This is not,' in caps, 'to imply that had the diagnosis been known such therapy would have had no impact on her chances of survival. It would certainly have improved her chances.'

"Did I read that correctly?

"A. Yes.

"Q. If I understand correctly, assuming that somebody had made the diagnosis and, or had referred her to a tertiary care facility where she received this type of supportive therapy, it would have improved her prospects, but there is no way to know whether even if all that was done, it would have ultimately affected the outcome?

"A. That's correct."

Finally, we note that the plaintiffs, after oral argument on the defendants' motions for summary judgment, submitted to the court an affidavit from Sommer on the issue of causation. Sommer averred therein that he could not state in terms of a specific percentage what the child's "personal chance of survival with appropriate treatment would have been . . . ." He once again, however, stated that the child's chances of survival, with appropriate treatment, "certainly would have been much higher than they were with her receiving none of such measures (as unfortunately happened), and that they would have been 'better than even.' "[4]

[4] Sommer attested in his affidavit, addressed to the plaintiffs' attorney, in pertinent part as follows:

"You have told me that a question has come up in your case . . . about whether Cassidy would have had 'a better than even chance to survive' from her Lympocytic myocarditis condition if she had received appropriate supportive care measures in a closely monitored setting . . . . In my opinion, she would have had a better than even chance, considering that 2/3rds

In its memorandum of decision, the court concluded, as a matter of law, that the foregoing evidence did not prove a causal link between the alleged negligent acts and a lost chance of survival. The court observed that Sommer's opinion as to the child's chances of survival was based solely on statistical evidence for *all* children suffering from lymphocytic myocarditis who receive adequate supportive care. As such, the court reasoned, Sommer's opinion was not based on the *particular* child in the present case. The court further reasoned that the statistical evidence Sommer provided as to chances for survival in general would not, as a matter of law, support a finding as to the child's chances for survival because Sommer did not relate such statistical probabilities to the particular child in this case.[5]

to as many as 80 percent of the children with Cassidy's kind of condition who receive such appropriate supportive care do survive their illness.

"As I said in my deposition, I cannot state whether she would have survived, or tell you that her personal chance of survival with appropriate treatment would have been 'x' percent, but I do feel strongly that her chances of survival with appropriate supportive care certainly would have been much higher than they were with her receiving none of such measures (as unfortunately happened), and that they would have been 'better than even.'

"It also can be stated with reasonable medical certainty that any child in the same condition as Cassidy when she was at the Backus Hospital in July, 1997, who received the same level of treatment as Cassidy did, would have had a 'better than even chance' of succumbing to her illness."

[5] The court, in large part, followed the reasoning related to the use of statistical evidence in lost chance cases that the Supreme Court of Missouri employed in *Wollen* v. *DePaul Heath Center*, 828 S.W.2d 681, 685–86 (Mo. 1992). The Missouri Supreme Court, in regard to the plaintiff's use of statistical evidence concerning the decedent's chance of survival, stated: "In the posture of this case, the Court assumes that the plaintiff can prove by a preponderance of the evidence that there was a statistical chance of survival. Regardless of the exact percent of individuals in the circumstances of the decedent, as long as there is a significant chance of either survival or death, the statistic cannot tell whether *the* decedent would have survived if properly diagnosed. A statistic of this kind typically predicts that, out of a random sample of a large number of people in decedent's circumstances—if properly diagnosed and treated—Y percent will live and Z percent will die. A specific individual, however, could be in either group. A jury could speculate as to which group a decedent would fall, but the statistical evidence—without more—does not give a jury a basis to believe that the decedent belongs to

As previously explained, Connecticut permits recovery for a lost chance provided that the evidence would permit a finder of fact to conclude reasonably that "more probably than not, the defendant's negligence was the direct and proximate cause of a decrease in the chance of successful treatment of the plaintiff's injury." *Poulin* v. *Yasner*, supra, 64 Conn. App. 744. There is no dispute that the plaintiffs needed to elicit expert medical evidence to demonstrate that the defendants caused a lost chance of survival. See *Shegog* v. *Zabrecky*, 36 Conn. App. 737, 745–46, 654 A.2d 771, cert. denied, 232 Conn. 922, 656 A.2d 670 (1995). The plaintiffs attempted to surmount that evidentiary burden through Sommer's expert testimony.

Although the court was bound to evaluate Sommer's testimony in the light most favorable to the plaintiffs' case, the court was free to scrutinize the basis of Sommer's expert opinion. That is so because "expert opinion cannot rest on surmise or conjecture because the trier of fact must determine probable cause, not possible cause. . . . In other words, the expert opinion must be based on reasonable probabilities." (Citations omitted; internal quotation marks omitted.) *Gordon* v. *Glass*, 66 Conn. App. 852, 856–57, 785 A.2d 1220 (2001), cert. denied, 259 Conn. 909, 789 A.2d 994 (2002). "Expert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase,

either the group that lives, or the group that dies. Therefore, regardless of whether the lost chance of survival is greater than or less than 50%, it is impossible to prove that decedent's death resulted from the failure to properly diagnose and treat." (Emphasis in original.) Id.

but rather, is determined by looking at the entire substance of the expert's testimony." (Internal quotation marks omitted.) *State* v. *Nunes*, 260 Conn. 649, 672, 800 A.2d 1160 (2002).

Under the approach adopted in Connecticut, the plaintiffs had to prove that the child probably would have survived had the defendants treated her in a nonnegligent manner. That *necessarily* required the plaintiffs to prove that prior to the defendants' alleged negligent acts or omissions, the child had at least a better than even chance of survival with adequate medical care. As previously explained, it is not sufficient for a lost chance plaintiff to prove merely that a defendant's negligent conduct has deprived him or her of *some* chance; in Connecticut, such plaintiff must prove that the negligent conduct *more likely than not* affected the actual outcome.

We conclude that the defendants demonstrated that a genuine issue of material fact did not exist as to whether, prior to their alleged negligent acts or omissions, the child had at least a better than even chance of survival with adequate treatment. The plaintiffs failed to substantiate their adverse claim by demonstrating that such an issue of fact existed. Our holding rests on our conclusion that a rational finder, relying on Sommer's testimony, could not find that such a chance of survival existed. The issue came up several times during Sommer's testimony. Sommer testified that with adequate supportive care, the child "had a very good chance of surviving." Sommer also opined that with such care, the child would have had " 'a better than even chance to survive.' " That testimony, however, is not dispositive. We must review the entire substance of Sommer's testimony to determine if it actually supports such a finding. Having done so, we conclude that it fails to rise to the level of reasonable medical certainty required to demonstrate causation.

The court looked disfavorably on Sommer's use of statistical data alone as a basis for his opinion as to the child's chances of survival. We need not reach that issue.[6] The problem with Sommer's testimony, in our view, is more fundamental; he testified that the statistical evidence on which he based his opinion as to the child's chance of survival *did not relate* to that particular child. Sommer, apparently relying solely on general statistical evidence, testified as to a better than average chance of survival. Sommer then testified that the statistical data he relied on "cannot be applied" to the patient at issue in this case. He also testified that he "cannot

---

[6] The dissent suggests that the issue before us is "whether the plaintiff's statistical probability evidence alone, in a medical malpractice action, based on the doctrine of a lost chance of survival, would prevent the defendants from obtaining a summary judgment." The dissent then concludes that the statistical evidence that Sommer discussed in his testimony, specifically, that up to 75 percent of all young children with the same disease as the child at issue would survive if given appropriate medical care, warranted a denial of the defendants' motions for summary judgment. The dissent recognizes, as well, that Sommer opined equivocally as to the child's chance of survival. Although Sommer may have been equivocal in that regard, he nonetheless unequivocally testified as to the flawed basis of any opinion concerning a specific chance of survival that he rendered. That is, he repeatedly testified that he had no way of assessing a specific chance of survival and that he was unable to rely on general statistical data in an attempt to assess such chance of survival for this patient. We, like the trial court, must evaluate the whole of Sommer's testimony to gauge its competence, to determine if it was based on reasonable medical probability. We respectfully conclude that because Sommer himself characterized the use of general statistical evidence to assess this particular child's chance of survival as "misleading" and because Sommer testified that it was "impossible to predict" the child's chance of survival, a finder of fact would lack any basis on which to somehow "apply" general statistical data or any other type of evidence to the child and conclude that she would have had a better than average chance of survival. Sommer himself did so and then testified that this application was not scientifically competent. If Sommer, on the basis of general statistical evidence, had rendered an expert opinion as to the child's chance of survival *and* had testified that a scientific basis existed for him to render such opinion, the issue before us would concern the use of statistical probability evidence alone to assess lost chance of survival. That he did not do. Consequently, we need look no further than Sommer's own testimony concerning the *scientific basis* of his opinion to gauge its merit.

state whether [the child] would have survived or [state] what her personal chance of survival with appropriate treatment would have been" and testified that there is no way to "prognosticate" as to the child's chances of survival. For those reasons, it cannot be said that Sommer opined as to the child's chance of survival with any degree of medical certainty; rather, any opinion appears to be based on mere speculation and is unrelated to the facts of this case. Indeed, characterizing the child's chance of survival as "impossible to predict," Sommer testified that he was unable to assign to the child, in terms of a specific percentage, a chance of survival.

The plaintiffs relied on Sommer to demonstrate the causal link essential to their claim. We conclude, as a matter of law, that his testimony does not provide a fact finder a basis on which to find that the child would have had a better than average chance of survival with adequate medical care.

In determining whether a genuine issue of material fact existed, the court must consider the *competency* of the evidence on which the plaintiffs relied to substantiate their adverse claim. In ruling on a motion for summary judgment, the court does sit as a trier of fact or evaluate the evidence from the perspective of a trier of fact. Its task, however, is to ask whether the state of the evidence on the challenged issue is of such a nature that a fact finder logically and legally could reach a finding either way with respect to the issue. Although we assume that a fact finder reasonably may resolve conflicts within a witness' testimony, we do not assume that a fact finder may rely on wholly unsupported or internally inconsistent expert testimony in reaching a finding.

In the present case, the fact finder could find only that a better than average chance of survival existed

if it relied on Sommer's testimony. Sommer testified without reservation about "global statistics" related to chances of survival. As our preceding analysis of his testimony details, Sommer then testified that he lacked any basis to apply those statistics to the child's case and revealed that he essentially could not opine with any degree of medical certainty as to what that particular child's chances of survival were. There was no basis for a jury to find that the child had a favorable chance of survival. On the basis of Sommer's testimony, a trier of fact could not reasonably infer otherwise. Expert opinion should apply specifically to the factual scenario that necessitated the expert opinion in the first place.[7] See *Wallace* v. *St. Francis Hospital & Medical Center*, supra, 44 Conn. App. 261–62.

The plaintiffs rely on our Supreme Court's holding in *Petriello* v. *Kalman*, 215 Conn. 377, 576 A.2d 474 (1990). The plaintiffs appear to argue that *Petriello* calls into question the approach to causation that this court has applied in *LaBieniec* and its progeny. We conclude that the plaintiffs' reliance on *Petriello* is to no avail.

In *Petriello*, our Supreme Court permitted a plaintiff to recover against her physician for a future risk that his negligent treatment of her would cause her injury. Specifically, the plaintiff demonstrated that the defendant physician performed a surgical procedure on her in a negligent manner, caused her to suffer injury and caused her to suffer a risk, from between 8 to 16 percent, that additional injuries would develop in the future as a result of the injuries he caused. Id., 381. The court permitted recovery on that future risk of harm even

---

[7] "While experts may testify to general scientific facts or doctrines which are pertinent to clarify the facts in issue, they cannot testify either as to general theories which have only a remote and conjectural application to the facts of the case, or as to general conditions or occurrences speculatively connected with the issues at bar." 31 Am. Jur. 2d, Expert and Opinion Evidence § 67 (2002).

though the plaintiff did not demonstrate that it was more likely than not that such harm would occur. The court held that "in a tort action, a plaintiff who has established a breach of duty that was a substantial factor in causing a present injury which has resulted in an increased risk of future harm is entitled to compensation to the extent that the future injury is likely to occur." Id., 397–98. "The probability percentage for the occurrence of a particular harm, the risk of which has been created by the tortfeasor, can be applied to the damages that would be justified if that harm should be realized." Id., 397.

The court reasoned that this rule's application warranted recovery in *Petriello* because the plaintiff already had proven that the increased risk of the injury's occurrence, of between 8 to 16 percent, was more likely than not caused by the defendant's negligence. The court stated that, this being the case, "there [was] no legitimate reason why [the plaintiff] should not receive present compensation based upon the likelihood of the risk becoming a reality." Id., 396. The court further stated that the plaintiff "should not be burdened with proving that the occurrence of a future event is more likely than not, when it is a present risk, rather than a future event for which she claims damages. . . . [I]t was fairer to instruct the jury to compensate the plaintiff for the increased risk of a bowel obstruction based upon the likelihood of its occurrence rather than to ignore that risk entirely. The medical evidence in this case concerning the probability of such a future consequence provided a sufficient basis for estimating that likelihood and compensating the plaintiff for it." Id.

*Petriello* holds that in a case involving damages for a *risk of future harm*, a plaintiff is entitled to recover for any increased risk of future harm, provided that such plaintiff has proven that it more likely than not that such increased risk exists. *Petriello* overruled earlier

Connecticut cases that had permitted a plaintiff to recover for a risk of future harm only if he or she had proven that there was at least a 51 percent chance that a future injury would result. Id., 398 n.11. In such cases, provided that the risk that a future injury would manifest itself was at least more probable than not, the law permitted a plaintiff to recover full compensation for such injury, even though it had not yet occurred. See id.

A case involving a *risk of future harm*, however, is entirely distinguishable from a case involving a *lost chance of survival*. There is no reason to interpret *Petriello*'s holding to in any way cast doubt on the law with regard to lost chance of survival cases, which requires that a defendant's negligent acts more likely than not affected the outcome. As previously discussed, this court has required plaintiffs to prove their claims under a traditional standard of causation. If a plaintiff cannot prove that a victim probably would have survived absent the negligent acts complained of, he or she cannot, of course, claim that the negligent acts more likely than not caused the victim's death. *Borkowski* v. *Sacheti*, supra, 43 Conn. App. 301. The plaintiffs clearly were required to prove a causal link between the child's death and the acts of negligence of which they complained. The plaintiffs apparently seek for us to abandon our requirement that a plaintiff prove that a better than even chance of survival existed in favor of a requirement, which permits recovery even where a lesser chance of survival is lost. The plaintiffs' argument, however, is unpersuasive and misses the point of the trial court's holding. The problem with the plaintiffs' case lies in how they attempted to substantiate their claimed causal link. As we have explained, Sommer's testimony does not afford a basis on which a fact finder could find that *any* chance of survival existed.

We do not read *Petriello* to in any way relax a plaintiff's burden to prove a causal link between negligent

acts and the harm for which he or she seeks compensation. *Petriello* permitted a plaintiff to recover for a measurable risk, albeit a risk of between 8 to 16 percent, that a future injury would result. The plaintiff in *Petriello* still was required to prove that such a present risk existed by a preponderance of the evidence. Whether the plaintiff in *Petriello* had established, by a preponderance of the evidence, that such future risk existed was not at issue. The plaintiff, however, was permitted to recover for the risk only after having proven that the breach of duty was a substantial factor in causing that risk. *Petriello* v. *Kalman*, supra, 215 Conn. 397–98.[8]

II

The plaintiffs, Ronda Drew, individually, and Michael Anzalone, next claim that the court improperly granted summary judgment in the defendants' favor with respect to their claims sounding in bystander emotional distress. We disagree.

The resolution of the plaintiffs' claim warrants little discussion. The plaintiffs concede that the bystander emotional distress claims are derivative of the claims sounding in medical malpractice. We agree. The claims are "inextricably attached" because the judgments with respect to the malpractice counts bar recovery with regard to those counts. See *Izzo* v. *Colonial Penn Ins. Co.*, 203 Conn. 305, 312, 524 A.2d 641 (1987). The plaintiffs' claims are based on a finding that the defendants' negligence caused the child's death and argue that we

---

[8] The plaintiffs also argue that *Petriello* implicitly recognizes the propriety of using general statistical evidence to prove a patient's chance of survival; see *Petriello* v. *Kalman*, supra, 215 Conn. 397; and take issue with the trial court's rationale in granting the defendants' motions for summary judgment. As stated previously, we need not address the specific issue concerning statistical evidence in proving that a chance of survival existed because that issue is not before us. We base our holding on the fact that Sommer explicitly stated that the statistics he relied on did not relate to this specific patient and that he found it impossible to assess the child's chance of survival.

should reverse the judgment on those claims after we conclude that they have made such a showing. We held in part I that the court properly rendered judgment in the defendants' favor with regard to the malpractice claims because the plaintiffs had not made such a factual showing. Accordingly, we affirm the court's judgment with respect to the remaining claims.[9]

The judgment is affirmed.

In this opinion WEST, J., concurred.

DUPONT, J., dissenting. I respectfully dissent. This case presents the issue of whether the plaintiffs' statistical probability evidence alone, in a medical malpractice action, based on the doctrine of a lost chance of survival, would prevent the defendants from obtaining a summary judgment. I do not agree that summary judgment should have been rendered because I think that the statistical evidence offered by the plaintiffs in this case sufficed for denying the motion. The plaintiffs submitted evidence of the deposition of a medical expert that there was a statistical probability that up to 75 percent of all young children with the same disease as the plaintiffs' daughter would survive, given appropriate medical care.[1]

There is no dispute that in Connecticut, in a loss of chance case, a plaintiff must prove entitlement to recovery by a traditional approach, namely, proof that the defendants' negligence, by a preponderance of the

---

[9] Having resolved that claim as we did, we, like the trial court, have no occasion on which to opine as to whether a claim for bystander emotional distress based on medical malpractice is legally cognizable.

[1] The majority has quoted the relevant deposition testimony and affidavit statements of Robert J. Sommer, a physician specializing in pediatric cardiology, which need not be repeated. I note, however, that some of the statements are equivocal as to whether the physician was opining about the relationship between the plaintiffs' child and the statistics or as to whether he could form no opinion as to the relationship between the statistics and the particular child's chance to survive had the alleged negligence not occurred.

evidence, proximately caused the injury, that is, the loss of a chance to survive.[2] The unanswered question in Connecticut, however, is whether, in some instances, statistical evidence from a medical expert, not particular to the patient, is sufficient to prove that it is more likely than not that a patient was deprived of a chance to survive. I would, in this case, answer the question by concluding that the statistical evidence alone was sufficient.

Loss of a chance to survive cases typically arise when a patient, already suffering from a preexisting, known or unknown condition, which places the patient at risk of death, alleges that the negligence of a defendant decreased that patient's chance to survive. In this case, the preexisting condition was not known until after the sixteen month old child of the plaintiffs died and an autopsy was performed. When a patient is very young, with no medical history of the disease or treatment of it, or no medical history at all, I would allow proof by a statistical analysis only. Without the use of statistical evidence, a prior blank medical slate would mean that such children could never be proven to have any probability of survival.

---

[2] A leading Connecticut case, *Borkowski* v. *Sacheti*, 43 Conn. App. 294, 299–315, 682 A.2d 1095, cert. denied, 239 Conn. 945, 686 A.2d 120 (1996), provides an excellent discussion of the differing standards of proof adopted by the states for the sufficiency of evidence to prove such claims. See also *Wallace* v. *St. Francis Hospital & Medical Center*, 44 Conn. App. 257, 688 A.2d 352 (1997); *LaBieniec* v. *Baker*, 11 Conn. App. 199, 526 A.2d 1341 (1987). *Borkowski* relied heavily on *Cooper* v. *Sisters of Charity of Cincinnati, Inc.*, 27 Ohio St. 2d 242, 272 N.E.2d 97 (1971), as did *LaBieniec*. The Ohio Supreme Court since has overruled *Cooper*. *Roberts* v. *Ohio Permanente Medical Group, Inc.*, 76 Ohio St. 3d 483, 488, 668 N.E.2d 480 (1996). The Connecticut rule and the former Ohio rule follow the traditional "all-or-nothing rule," which "went largely unchallenged in United States personal injury cases until about fifteen years ago. Since then, however, there has been a dramatic shift in the law, especially in the setting of medical malpractice." J. King, Jr., " 'Reduction of Likelihood' Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine," 28 U. Mem. L. Rev. 492, 502 (1998).

The quantum aspects of a loss of a chance to survive can never be precisely known. "Chance" connotes uncertainty and the unknown. The concept of the cause of action for lost chance or loss of chance arises out of a lack of information as to the future or as to what might have been, absent negligence, and can only be an estimate based on hypotheticals. The many courts, in addition to Connecticut, that recognize such actions; see, e.g., *Hicks* v. *United States*, 368 F.2d 626 (4th Cir. 1966); *Thompson* v. *Sun City Community Hospital, Inc.*, 141 Ariz. 597, 688 P.2d 605 (1984); *Roberson* v. *Counselman*, 235 Kan. 1006, 686 P.2d 149 (1984); *Perez* v. *Las Vegas Medical Center*, 107 Nev. 1, 805 P.2d 589 (1991); *Hamil* v. *Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978); *Ehlinger* v. *Sipes*, 155 Wis. 2d 1, 454 N.W.2d 754 (1990); see also 2 Restatement (Second), Torts § 323 (1965); Restatement, Torts § 26 (Tentative Draft No. 2); and the many law review articles written on the cause of action; see, e.g., J. King, Jr., "Causation, Valuation, and Chance in Personal Injury Torts Involving Preexiting Conditions and Future Consequences," 90 Yale L.J. 1353 (1981); D. Fischer, "Tort Recovery for Loss of a Chance," 36 Wake Forest L. Rev. 605 (2001); all recognize that the destruction of a chance to survive in medical malpractice cases merits compensation, if causation is proven by the particular standard of proof required by the decisional jurisdiction. All of the authorities are aware that the more that is known statistically and otherwise about the particular patient, the better able medical experts can identify with some degree of accuracy who would survive and who would not if the negligent act alleged had not happened. But no matter how much information we have, it cannot ever be known with absolute certainty which patients would live and which would die.

Because the probability of survival in this case could never be known without statistics, the loss of a chance

doctrine could never be utilized to effect a recovery because no individualized information was available due to the age of the child and the fact that the disease had not previously been diagnosed. "It should not matter whether the victim's prospects are assessed by individualized or statistical evidence, or both." J. King, Jr., " 'Reduction of Likelihood' Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine," 28 U. Mem. L. Rev. 492, 542 (1998).

In some cases, such as this one, the patient is very young, and the preexisting condition is not known until after death and after an autopsy has been performed. The only existing evidence in such cases is statistical. Children of parents who have not had pediatric care from birth to the date of the alleged injury may have no prior medical records and would have no way of ever proving the probability of survival without the use of statistics. In cases where a small child has a nonexistent medical slate, nothing can be known except the circumstances of the death and an autopsy report, unless statistics are used.

We use statistics in other types of cases. Statistical analyses, namely, actuarial tables for life expectancy, unrelated to a particular person, are used in determining compensation for the destruction of earning capacity in death actions. "With respect to awards for permanent injuries, actuarial tables of average life expectancy are commonly used to assist the trier in measuring the loss a plaintiff is likely to sustain from the future effects of an injury. Such statistical evidence does, of course, satisfy the more likely than not standard as to the duration of a permanent injury." *Petriello* v. *Kalaman*, 215 Conn. 377, 397, 576 A.2d 474 (1990); see also *State* v. *Villafane*, 164 Conn. 637, 647, 325 A.2d 251 (1973) (statistics in context of grand jury selection). *Petriello* is cited by the leading commentator on lost chance, Professor Joseph King, Jr., as applying "the loss of a

chance doctrine in the future consequences situation." J. King, Jr., supra, 28 U. Mem. L. Rev. 510 n.64. If statistics can be used to evaluate the future effects of an injury to gauge the length of time over which the effects may last, without regard to the particular life expectancy of a claimant, which can never be known with certainty, I think a statistical analysis can be used in some lost chance of survival cases.

"The nature of the evidence should not matter except to aid the trier of fact in estimating the likelihood that the desired outcome would have been achieved but for the plaintiff's negligence." Id., 492. In many cases, a determination of the probable likelihood may be an amalgam of all of the evidence, both personalized and statistical. In other cases, that likelihood may be known only through the use of statistics or averages.

The loss of a chance in this case is based on a hypothetical event, namely, the survival of a child if she had been transferred to a pediatric intensive care or tertiary care center several hours before she experienced cardiopulmonary arrest. I would have denied the defendants' motions for summary judgment because the statistical evidence alone, in my view, was sufficient to establish that this young child had a chance of survival of up to 75 percent. Viewing this statistical evidence, the child's age and the information on her autopsy report in the light most favorable to the plaintiffs, as must be done in determining the defendants' motion for summary judgment, I would not have granted the motion. I think that a jury, as fact finders, should have been allowed to consider the plaintiffs' claim of the lost chance of survival of their daughter.