# EMMETT ESCOBAR-SANTANA ET AL. *v.* STATE OF CONNECTICUT
## (SC 20772)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Ecker and Alexander, Js.

*Syllabus*

Pursuant to statute (§ 4-160 (f)), the state's sovereign immunity is waived
with respect to qualified medical malpractice actions, and such actions
may proceed against the state without the need for prior authorization
from the Claims Commissioner, but "[a]ny such action shall be limited
to medical malpractice claims only . . . ."

Pursuant further to statute (§ 52-190a (a)), in any "civil action . . . to
recover damages resulting from personal injury . . . in which it is
alleged that such injury . . . resulted from the negligence of a health
care provider," a plaintiff must "obtain a written . . . opinion of a
similar health care provider . . . that there appears to be evidence of
medical negligence . . . ."

The plaintiffs, C and her minor child, E, sought to recover damages for the
alleged medical malpractice of the defendant, the state of Connecticut,
through its servants, agents, and employees, that occurred prior to and
during the birth of E. C was admitted to a state hospital for an induction
of labor. During labor, it was determined that E was malpositioned and
that a vaginal delivery would pose risks. C was then counseled on
possible delivery options, including a manual rotation of E's head to
allow for the potential for a vaginal delivery. C agreed to the manual
rotation, which was unsuccessful. At that point, the delivery plan was

Escobar-Santana *v.* State

changed to a cesarean section. The cesarean section ultimately took an extended period of time, and E suffered permanent injuries in the process. In the first count of their complaint, the plaintiffs sought to recover for E's physical injuries. In the second count of their complaint, the plaintiffs incorporated by reference most of the allegations set forth in the first count, including all of the various ways in which the state failed to exercise reasonable care and the resulting injuries to E. The plaintiffs also alleged in the second count that C had endured a painful delivery and suffered severe and ongoing psychological, physiological, and emotional distress. The plaintiffs further alleged in the second count that the state knew or should have known that its conduct involved an unreasonable risk of causing emotional distress and that the distress might result in illness or bodily harm. The plaintiffs attached to their complaint, pursuant to § 52-190a (a), a certificate of good faith and a copy of an expert opinion letter from a similar health care provider. The expert opined in that letter, to a reasonable degree of medical certainty, that the state departed from the applicable standard of care in that it, among other things, failed to inform C regarding the risks of attempting a vaginal delivery, to counsel C regarding delivery options prior to inducing labor, and to use the proper technique required to deliver E by cesarean section. The state filed a motion to dismiss the second count of the plaintiffs' complaint, contending that that count stated a claim for negligent infliction of emotional distress or bystander liability, rather than medical malpractice, and, therefore, did not fall within the statutory waiver of the state's sovereign immunity in § 4-160 (f). The trial court denied the motion, concluding that the second count reasonably could be understood to sound in medical malpractice, and the state appealed. *Held*:

1. The term "medical malpractice claims" in § 4-160 (f) is broad enough to encompass a birthing mother's allegation that she suffered emotional distress from physical injuries to her child that had been proximately caused by the negligence of health care providers during the birthing process:

   Insofar as neither § 4-160 (f) nor other statutes specifically defined the term "medical malpractice," this court looked to the legislative history of § 4-160 (f) and to other statutes to construe that term, and determined that the universe of medical malpractice actions that fall within § 4-160 (f) is coextensive with those actions subject to the requirement of § 52-190a (a) that an opinion letter from a similar health care provider be filed with the complaint.

   This court also determined that, in light of the use of the term "personal injury" in § 52-190a (a) and the legislature's definition of "personal injury" elsewhere in the General Statutes as encompassing emotional distress, the legislature did not categorically preclude medical malpractice claims for purely emotional damages.

347 Conn. 601 AUGUST, 2023 603

Escobar-Santana *v.* State

This court acknowledged a growing trend in the common law of permitting liability for purely emotional distress under circumstances in which the defendant's alleged negligence has placed the plaintiff in danger of immediate bodily harm or has occurred in the course of specified categories of activities, undertakings or relationships in which negligent conduct is especially likely to cause serious emotional harm, such as when a physician negligently causes the loss of a fetus.

Moreover, this court recognized that a number of other state courts and Connecticut Superior Court judges have concluded, under their common-law authority, that a birthing mother may recover damages for the purely emotional distress she experiences as a result of medical malpractice resulting in the physical injury to or death of her fetus or infant during the labor and delivery process.

Consistent with this trend, this court concluded that, when a fetus or infant suffers physical injuries as a result of medical malpractice during the labor and delivery process, the birthing mother is a joint victim of the malpractice and can recover for emotional distress arising from her traumatic experiences during and immediately following that process, and the mother's recovery is not limited to damages arising from her own physical injuries.

Accordingly, C was not precluded from asserting a medical malpractice claim against the state for damages based on purely emotional distress.

2. In light of the plaintiffs' allegations in the second count of the complaint and consistent with the obligation to construe pleadings in the light most favorable to the plaintiffs, this court concluded that the second count could be read to allege a medical malpractice claim on behalf of C, and, accordingly, the trial court properly denied the state's motion to dismiss that count of the complaint:

Although claims for negligent infliction of emotional distress and bystander emotional distress, even in the health care context, are causes of action distinct from medical malpractice, and the waiver of sovereign immunity in § 4-160 (f) does not extend to such claims, to the extent that certain portions of the second count of the complaint could have been read to allege such causes of action exclusively, the elimination of those portions of the complaint could have been accomplished by a request to revise.

To ascertain whether a claim qualifies as a medical malpractice claim, multiple factors are considered, including whether the defendant is being sued in his or her capacity as a medical professional, whether the alleged negligence was of a specified medical nature that arose out of the medical professional-patient relationship, whether the alleged negligence was substantially related to medical diagnosis or treatment, and whether the alleged conduct involved the exercise of medical judgment.

Escobar-Santana *v.* State

In the present case, the second count of the complaint incorporated by reference numerous allegations set forth in the first count, which undisputedly asserted a medical malpractice claim, all of the allegations of negligence arose out of the relationship between C, the patient, and her physicians and health care providers, who were employees or agents of the state, and the allegations involved the alleged breach of the standard of care by hospital staff while they were operating in their professional medical capacities.

Moreover, the second count of the complaint apparently was brought pursuant to § 4-160, the plaintiffs attached to the complaint, in accordance with § 52-190a (a), a certificate indicating that there were grounds for a good faith belief that there had been negligence in the care and treatment of C and included a copy of a similar health care provider's letter addressing the issue of whether the standard of care was breached in the prenatal and intrapartum care of C, and expert testimony likely will be required to establish the state's liability under that count of the complaint.

*(One justice concurring separately)*

Argued February 22—officially released August 22, 2023

*Procedural History*

Action seeking damages for the defendant's alleged medical malpractice, brought to the Superior Court in the judicial district of Hartford, where the court, *Sicilian, J.*, denied the defendant's motion to dismiss, from which the defendant appealed. *Affirmed.*

*Michael G. Rigg*, for the appellant (defendant).

*Alinor C. Sterling*, with whom were *Kathleen Nastri* and, on the brief, *Sarah Steinfeld*, for the appellees (plaintiffs).

*Opinion*

MULLINS, J. General Statutes § 4-160 (f)[1] waives the state's sovereign immunity with respect to qualified

_____

[1] At the time the present action was commenced, § 4-160 (f) was codified at General Statutes (Rev. to 2021) § 4-160 (b). Subsequently, No. 21-91, § 6, of the 2021 Public Acts redesignated subsection (b) as subsection (f) and made certain other changes to the provision that have no bearing on the merits of this appeal. The provision was also the subject of technical amendments in 2022 and 2023. See Public Acts 2023, No. 23-131, § 10; Public Acts 2022, No. 22-37, § 4. In the interest of simplicity, unless otherwise indicated, we refer to the current version of the statute.

The text of § 4-160 (f) is set forth in part II B of this opinion.

Escobar-Santana *v.* State

medical malpractice actions and allows such actions
to proceed against the state without the need for prior
authorization from the Claims Commissioner. The stat-
ute also expressly provides that "[a]ny such action shall
be limited to medical malpractice claims only . . . ."
General Statutes § 4-160 (f). The primary question pre-
sented by this interlocutory appeal is whether the statu-
tory phrase "medical malpractice claims" is broad
enough to encompass a mother's allegation that she
suffered emotional distress damages from physical
injuries to her child that were proximately caused by
the negligence of health care professionals during the
birthing process. We hold that claims alleging such dam-
ages can qualify as medical malpractice claims for pur-
poses of § 4-160 (f). Accordingly, we conclude that the
trial court properly denied the motion of the defendant,
the state of Connecticut, to dismiss the second count of
the complaint of the plaintiffs, Celine Escobar-Santana
(Escobar-Santana) and her son, Emmett Escobar-San-
tana (Emmett),[2] because the plaintiffs alleged a valid
medical malpractice claim in that count.

I

The complaint and a copy of the expert opinion letter
attached thereto alleged the following facts. The state
operates the University of Connecticut Health Center/
John Dempsey Hospital in Farmington, which provides
prenatal care and labor and delivery services through
the UConn Health Women's Center (UConn). Between
September 1, 2019, and March 25, 2020, UConn under-
took the care and treatment of Escobar-Santana for
pregnancy, labor, and delivery.

_____

[2] Although Emmett, a minor, appears as the named plaintiff in this case,
the action was actually brought by Escobar-Santana, both individually and
on behalf of Emmett as Emmett's parent, as the general rule in Connecticut
is that "minor children may . . . sue [only] by way of a parent or next
friend." *Mendillo* v. *Board of Education*, 246 Conn. 456, 460 n.3, 717 A.2d
1177 (1988), overruled in part on other grounds by *Campos* v. *Coleman*,
319 Conn. 36, 123 A.3d 854 (2015).

Escobar-Santana *v.* State

During a March 3, 2020 visit to a walk-in clinic, Esco-bar-Santana was diagnosed with elevated blood pressure, influenza, and proteinuria (the presence of abnormally high levels of protein in the urine). On March 17, during a routine prenatal visit, sonography revealed that the estimated fetal weight was above the ninetieth percentile and the abdominal circumference was above the ninety-fifth percentile. On March 23, Escobar-Santana complained of bilateral leg swelling and continued elevated blood pressure. She was admitted at that time for an induction of labor.

On March 25, 2020, following two days of treatment with oxytocin but relatively minimal progress in her labor, Escobar-Santana developed a fever. By 7:20 p.m., her temperature had risen to 101.8 degrees Fahrenheit. At 8:30 p.m., she began pushing.

At 9:04 p.m., Kristyn Esteves, an obstetrical resident at UConn, conducted a manual exam and, on the basis of palpation, concluded that the fetus could have been in a right occiput transverse position that would make safe vaginal delivery improbable. Two hours later, at approximately 11 p.m., David Park, a board-certified obstetrician at UConn, performed a fetal sonograph and determined that the fetus was, in fact, malpositioned in a occiput posterior presentation.[3] He counseled Escobar-Santana regarding various possible delivery options, including manually rotating the fetus' head so as to proceed with vaginal delivery. She agreed to try manual rotation, but the pain was intolerable. Accordingly, due to maternal exhaustion, the delivery plan was changed to cesarean section (C-section) for failure to progress. Because of the length of labor and the fetal positioning,

---

[3] In the occiput posterior position, the baby's head is down but faces the mother's front instead of her back, which makes it more difficult to traverse the pelvis. See generally E. Brunelli et al., "The Role of the Angle of Progression in the Prediction of the Outcome of Occiput Posterior Position in the Second Stage of Labor," 225 Am. J. Obstetrics & Gynecology 81.e1 (2021).

Escobar-Santana *v.* State

however, the fetus' head had become impacted in the maternal pelvis.

During the delivery by C-section, which commenced at 11:51 p.m., at least one health care provider placed a hand into Escobar-Santana's vagina and applied force to push up on the fetal head. Whereas a C-section can normally be accomplished in less than one minute, in this case, twenty-four minutes were required to extract the baby. Emmett suffered serious and permanent injuries in the process.

The plaintiffs brought the present action in two counts. Although the plaintiffs alleged injuries to Emmett in count one and injuries to Escobar-Santana in count two, there is substantial overlap, as the plaintiffs alleged in each count that the state, via UConn and its servants, agents, and employees, including Park and Esteves, was negligent in at least seventeen respects prior to and during the birthing process. Several of these allegations relate specifically to Emmett, such as the contentions that physicians ''failed to safely manually rotate the baby's head'' and ''failed to accurately and timely communicate with staff regarding the disengagement of the fetal head from the pelvis . . . .'' The plaintiffs also addressed in each count the state's failure to exercise reasonable care specifically with respect to Escobar-Santana. For example, the plaintiffs alleged that the state ''failed to adequately and properly care for . . . Escobar-Santana during labor and delivery,'' ''failed to discuss and offer counsel to . . . Escobar-Santana regarding delivery options,'' ''failed to provide physicians who [possess] the requisite knowledge, skill, and experience to adequately and properly care for, treat, diagnose, monitor, and supervise . . . Escobar-Santana during labor and delivery,'' and ''failed to promulgate and/or enforce rules, regulations, standards, and protocols for the treatment of patients such as . . . Escobar-Santana.'' Most of the allegations, however,

Escobar-Santana *v.* State

encompass the state's joint care of Escobar-Santana and Emmett during the birthing process.[4]

The plaintiffs alleged in count one of their complaint that the state's negligence resulted in various severe, painful, and permanent injuries to Emmett. These include respiratory distress, facial bruising, trauma to the soft tissues of the head, multiple intracranial hemorrhages and hematomas, multiple skull fractures requiring surgical repair, scarring, head deformity, permanent brain damage, and other permanent psychological, physiological, and neurological sequelae.

In count two of their complaint, the plaintiffs alleged negligence claims on behalf of Escobar-Santana but incorporated by reference most of the allegations of count one, including all of the various ways in which the state failed to exercise reasonable care, as well as the resulting injuries to Emmett. The plaintiffs then further alleged that Escobar-Santana endured a "traumatic, terrifying and painful" delivery and suffered severe and ongoing psychological, physiological, and emotional distress. These conditions, the plaintiffs alleged, are painful, serious, and permanent in their nature and effects and have impaired Escobar-Santana's ability to carry on and enjoy life's activities. The plaintiffs further contended that the state and its employees "knew or should have known that their conduct involved an unreasonable risk of causing emotional distress and that the distress might result in illness or bodily harm."

_____

[4] In their complaint, the plaintiffs alleged, for example, that the state "failed to recognize and consider prenatal input from maternal-fetal medicine specialists," "failed to recognize that . . . Escobar-Santana's cervix was unfavorable for induction," "failed to recognize and appreciate the need for early ultrasound imaging to determine the position of the baby during labor," "failed to intervene in a timely manner," "failed to make safe treatment choices for delivery," "failed to perform a timely [C-section]," and "failed to keep proper and adequate medical records . . . ."

Escobar-Santana *v.* State

The plaintiffs attached to the complaint, per the requirements of General Statutes § 52-190a (a), a certificate of good faith and a copy of an expert opinion letter from a similar health care provider, namely, a board-certified physician who practices, publishes, teaches, and consults in the fields of obstetrics, gynecology, and maternal-fetal medicine. This expert opined, to a reasonable degree of medical certainty, that UConn, Park, and Esteves departed from the applicable standard of care in various respects. Most notably for present purposes, because Escobar-Santana was predisposed to obstructed labor and shoulder dystocia (a complication of vaginal delivery in which the baby's shoulder gets caught above the mother's pubic bone) as a result of her short stature, her obesity, and the disproportionate overgrowth of her fetus, her providers should have been knowledgeable about and informed her regarding the risks to her and the fetus of attempting vaginal delivery. In addition, the plaintiffs' expert opined that Emmett's injuries suggest the use of an inappropriate technique to elevate the fetal head: the head should have been flexed by broadly applied pressure on the fetal cranium during elevation. The expert concluded that UConn, Park, and Esteves departed from the applicable standard of care in that they "(1) failed to recognize the significance of the maternal-fetal medicine physician's prenatal report that documented marked fetal overgrowth, (2) failed to counsel [Escobar-Santana] regarding delivery options prior to labor induction, and (3) failed to use or instruct the use of proper technique required to deliver the baby during delivery by [C-section]." The expert opined that this negligence was a proximate cause of Emmett's injuries.[5]

The state filed a motion to dismiss count two of the complaint, contending that the count states a claim for

---

[5] There is no requirement that the expert opine that the negligence was a proximate cause of Escobar-Santana's injuries. See *Dias* v. *Grady*, 292 Conn. 350, 359–60, 972 A.2d 715 (2009).

Escobar-Santana *v.* State

negligent infliction of emotional distress or bystander liability, rather than medical malpractice, and, therefore, does not fall within the statutory waiver of the state's sovereign immunity in § 4-160 (f). The trial court denied the motion, concluding that, when the complaint is construed in the light most favorable to the plaintiffs, and every reasonable presumption is made in favor of jurisdiction, count two reasonably can be understood to sound in medical malpractice. The state subsequently filed a motion to reargue and to reconsider, which the trial court granted, but, after reargument and reconsideration, the court upheld its prior decision.[6] This appeal followed.[7]

## II

On appeal, the state renews its claim that count two of the complaint sounds in negligent infliction of emo-

[6] In the motion to reconsider, the state asked the trial court to dismiss, at the very least, those portions of count two in which the plaintiffs alleged causes of action other than medical malpractice. In paragraph 16 of count two of the complaint, for example, the plaintiffs alleged that "[t]he . . . state . . . and its servants, agents, apparent agents and/or employees, knew or should have known that their conduct involved an unreasonable risk of causing emotional distress and that the distress might result in illness or bodily harm." As we explain in footnote 16 of this opinion, that language states a claim for negligent infliction of emotional distress. In paragraph 17 of count two of the complaint, the plaintiffs also alleged that Escobar-Santana's various injuries were reasonable, which she need not establish to prevail on a medical malpractice claim.

We note that, in their opposition to the state's motion to dismiss, the plaintiffs made clear that (1) count two of their complaint sounds in medical malpractice, rather than bystander liability or negligent infliction of emotional distress, (2) the primary dispute between the parties was whether Escobar-Santana's allegations made out a valid medical malpractice claim predicated on purely emotional damages, and, therefore, (3) the proper vehicle for the state to assert its challenge was a motion to strike count two rather than a motion to dismiss. Nonetheless, the state has continued to characterize the count as something other than a medical malpractice claim, thereby allowing it to take an interlocutory appeal and delay the resolution of the case. "Just because the [s]tate *can* do something does not mean that it *should*." (Emphasis in original.) *Hall* v. *Ramirez*, Docket No. 1:18-cv-00218-BLW, 2018 WL 3633916, *3 (D. Idaho July 31, 2018).

[7] The state appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Escobar-Santana *v.* State

tional distress or bystander liability, rather than medical malpractice, and, therefore, is barred by the state's sovereign immunity because it was neither authorized by the Claims Commissioner, nor does it fall within the ambit of § 4-160 (f), which provides for a waiver of sovereign immunity without the approval of the Claims Commissioner. The state further contends that, even if the plaintiffs did allege a medical malpractice claim in count two, insofar as count two incorporates by reference the allegations of count one, which relate solely to Emmett, it does not state a colorable medical malpractice claim as to Escobar-Santana specifically. This is true, the state argues, because there is no allegation that Escobar-Santana suffered *physical* injuries as a result of the state's malpractice,[8] and she cannot recover in medical malpractice for purely emotional distress in the absence of physical harm. We disagree.

Consistent with the modern trend and the rule that has been adopted by a majority of our sister states and Superior Court judges who have considered the issue, we hold that, when a fetus or infant suffers physical injuries as a result of medical malpractice during the labor and delivery process, the birthing mother is a joint victim of the malpractice and can recover for emotional distress arising therefrom. We further conclude that count two of the complaint properly stated a cause of action for medical malpractice.

A

We begin with the standard of review. "We have long held that because [a] determination regarding a trial

_____

[8] We note that the plaintiffs alleged that Escobar-Santana endured a painful childbirth, that the failed vaginal delivery involved hospital staff's application of pressure to her vaginal area, and that she has suffered physiological distress. It seems clear, then, that she is alleging her own independent physical injuries and associated pain and suffering. The primary question that we address in this opinion, however, is whether a mother such as Escobar-Santana also can recover emotional distress damages arising from injuries to her fetus or infant during the labor and delivery process.

Escobar-Santana *v.* State

court's subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *Levin* v. *State*, 329 Conn. 701, 706, 189 A.3d 572 (2018). Specifically, because the scope of the waiver of sovereign immunity for medical malpractice claims contained in § 4-160 (f) presents a question of statutory interpretation, we exercise plenary review. See, e.g., *Day* v. *Seblatnigg*, 341 Conn. 815, 826, 268 A.3d 595 (2022); see also, e.g., 2 Restatement (Third), Torts, Liability for Physical and Emotional Harm § 47, comment (g), p. 179 (2012) (determination of which relationships will support liability for purely emotional harm is matter of law for court).

The following well established principles also guide our analysis. "[W]hen the doctrine of sovereign immunity is applicable, the state must consent to be sued in order for a claimant to pursue any monetary claim against the state." (Internal quotation marks omitted.) *Levin* v. *State*, supra, 329 Conn. 709. The Claims Commissioner may waive sovereign immunity and consent to suit pursuant to § 4-160 (a). Id. Other statutory waivers are also available, but "[a]ny statutory waiver of immunity must be narrowly construed . . . and its scope must be confined strictly to the extent the statute provides." (Internal quotation marks omitted.) Id. In the absence of prior authorization by the Claims Commissioner, or some other statutory waiver, the Superior Court has no jurisdiction to hear any monetary claim against the state. Id.

B

Because the scope of the waiver afforded by § 4-160 (f) presents a question of statutory interpretation, our review begins with the language of the statute. See General Statutes § 1-2z. Section 4-160 (f) provides in relevant part: "In any claim alleging malpractice against the state, a state hospital or against a physician, sur-

Escobar-Santana *v.* State

geon, dentist, podiatrist, chiropractor or other licensed health care provider employed by the state, the attorney or pro se party filing the claim may submit a certificate of good faith to the Office of the Claims Commissioner in accordance with section 52-190a. If such a certificate is submitted, permission to sue the state shall be deemed granted by the Claims Commissioner . . . . In lieu of filing a notice of claim . . . a claimant may commence a medical malpractice action against the state prior to the expiration of the limitation period set forth in section 4-148 and authorization for such action against the state shall be deemed granted. *Any such action shall be limited to medical malpractice claims only* and any such action shall be deemed a suit otherwise authorized by law in accordance with subsection (a) of section 4-142 . . . .'' (Emphasis added.)

One thing is clear. The waiver of sovereign immunity afforded by subsection (f) of § 4-160 extends no further than medical malpractice actions. Until 2019, the provision—then codified at General Statutes (Rev. to 2019) § 4-160 (b)—referenced malpractice actions only in the first clause: "In any claim alleging malpractice against the state . . . ." Prior to that time, malpractice actions against the state had to go through the Claims Commissioner, but approval was automatic as long as the plaintiffs satisfied the requirements of § 52-190a. In 2019, the legislature amended the statute to provide an alternative path by which plaintiffs could bypass the Claims Commissioner altogether, and it added the language providing that "[a]ny such action shall be limited to medical malpractice claims only . . . ." Public Acts 2019, No. 19-182, § 4 (P.A. 19-182).

Neither this statute, however, nor any other provision of the General Statutes defines the terms "medical malpractice," "medical malpractice action," or "medical malpractice claim." The precise question presented by this appeal is not addressed on the face of the statute.

Escobar-Santana *v.* State

Dictionaries also are of little help in identifying whether and when "medical malpractice" can encompass claims for emotional distress in the absence of physical injury. Black's Law Dictionary, for example, defines "medical malpractice" as "[a] doctor's failure to exercise the degree of care and skill that a physician or surgeon of the same medical specialty would use under similar circumstances." Black's Law Dictionary (11th Ed. 2019) p. 1148. It adds that, as in any other negligence action, the medical malpractice plaintiff must establish proximate cause and damages, as well as breach of the professional duty of care. See id. But this dictionary definition does not speak to whether, and under what circumstances, emotional distress damages in the absence of physical injury are available in such actions.

To ascertain the legislature's intent with respect to *that* issue, we look, first, to other, related sections of the General Statutes; see General Statutes § 1-2z; and, second, to our common law of negligence, which the legislature is presumed not to have abrogated without a clear statement to that effect. See, e.g., *Pacific Ins. Co.*, *Ltd.* v. *Champion Steel, LLC*, 323 Conn. 254, 269–70, 146 A.3d 975 (2016). We consider each in turn.[9]

1

Although the term "medical malpractice" is not defined in § 4-160 (f), other sections of the General Statutes do help to illuminate the intent of the legislature. Section 4-160 (f) was enacted to address and to help relieve the yearslong case backlog at the Office of the Claims Commissioner. See, e.g., *Matakaetis* v. *State*,

---

[9] Because the statute is ambiguous with respect to the question before us, we also may look to the legislative history of the statute. See, e.g., *Dias* v. *Grady*, 292 Conn. 350, 356, 972 A.2d 715 (2009); see also General Statutes § 1-2z. We note, however, that the parties have not identified, and our review did not reveal, anything in the legislative history of P.A. 19-182, § 4, that resolves this question.

Escobar-Santana *v.* State

Docket No. HHD-CV-21-6144726-S, 2021 WL 6334962, *4–6 (Conn. Super. December 20, 2021). In 1998, the legislature eliminated the need for the Claims Commissioner to review medical malpractice claims against the state by providing for automatic approval of such claims upon the submission of a certificate of good faith pursuant to General Statutes (Rev. to 1997) § 52-190a (a). See Public Acts 1998, No. 98-76, § 1; see also, e.g., *Matakaetis* v. *State*, supra, *4. To show the existence of such good faith, plaintiffs had to obtain a written opinion of a "similar health care provider . . . ." General Statutes (Rev. to 1997) § 52-190a (a). In 2019, the legislature went further, permitting plaintiffs to forgo the Claims Commissioner's approval entirely by filing a timely medical malpractice action in the Superior Court. See P.A. 19-182, § 4; see also, e.g., *Matakaetis* v. *State*, supra, *4–5. Of course, filing a medical malpractice action in the Superior Court directly still requires that the plaintiffs submit a certificate of good faith. See General Statutes § 52-190a (a). It seems clear, then, that the legislature, in enacting § 4-160 (f), substituted one gatekeeper for another. There is no need for the Claims Commissioner, who has no particular expertise in these matters, to expend scarce resources ascertaining whether a plaintiff has a colorable medical malpractice claim when a good faith certificate and expert opinion letter demonstrate as much, or, if challenged, will be subject to the scrutiny of the Superior Court.[10] This suggests that the universe of medical malpractice actions subject to § 4-160 (f) is coextensive with those actions subject to § 52-190a.[11]

[10] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 2019 Sess., p. 3284, remarks of Claims Commissioner Christy Scott ("[b]ecause the [S]uperior [C]ourt . . . is fully capable of determining whether a claimant has satisfied the criteria of § 52-190a . . . there is no particular purpose served in requiring such claims to be filed with the Claims Commissioner and, given the [Claims] Commissioner's ongoing backlog, there is affirmative harm [in] requiring that such claims continue to be filed there").

[11] The legislative history confirms as much. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 2019 Sess., pp. 3283–84, remarks of

Escobar-Santana *v.* State

Section 52-190a (a) applies to any "civil action or apportionment complaint . . . to recover damages resulting from personal injury or wrongful death . . . whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider . . . ." It requires, among other things, that "the claimant . . . obtain a written and signed opinion of a similar health care provider, as defined in section 52-184c, which similar health care provider shall be selected pursuant to the provisions of said section, that there appears to be evidence of medical negligence and includes a detailed basis for the formation of such opinion."[12] General Statutes § 52-190a (a). In *Dias* v. *Grady*, 292 Conn. 350, 972 A.2d 715 (2009), we concluded that the phrase "medical negligence" in that provision is susceptible to more than one reasonable interpretation, and, having reviewed the legislative history, we treated that phrase as synonymous with "medical malpractice," meaning "breach of the standard of care . . . ." Id., 356–59.

Section 52-190a (a) expressly addresses the issue of damages, requiring a certificate of good faith in order to bring an action "to recover damages resulting from personal injury or wrongful death . . . ." Although the term "personal injury" also is not defined for purposes of this section, the legislature has defined that phrase elsewhere in the General Statutes. For example, for purposes of chapter 968 of the General Statutes, which

Claims Commissioner Christy Scott; 41 H.R. Proc., Pt. 8, 1998 Sess., pp. 2695–97, remarks of Representative Richard D. Tulisano.

[12] General Statutes § 52-184c (a) further defines such actions, providing in relevant part that, "[i]n any civil action to recover damages resulting from personal injury or wrongful death . . . in which it is alleged that such injury or death resulted from the negligence of a health care provider . . . the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. . . ."

Escobar-Santana *v.* State

provides services for crime victims, " '[p]ersonal injury' means . . . actual bodily harm *or emotional harm* . . . .'' (Emphasis added.) General Statutes § 54-201 (2). Other statutes also suggest that, under at least some circumstances, "personal injury" can encompass purely emotional distress. See, e.g., General Statutes § 52-231b ("[i]n any action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault"); General Statutes § 52-577d ("[n]otwithstanding the provisions of section 52-577, no action to recover damages for personal injury to a person under twenty-one years of age, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought"); General Statutes § 54-211 (d) (1) (C) (crime victim may receive compensation for personal injury "in cases of emotional harm only"). At the very least, then, the legislature has not categorically precluded medical malpractice claims for purely emotional damages.[13] Nevertheless, our review of related statutes does not answer the question of whether the legislature intended to allow medical malpractice claims alleging solely emotional distress damages to proceed under § 4-160 (f).

2

Because the legislature has not directly addressed the question of whether and when a claim for purely

_____

[13] The state relies on *Maloney* v. *Conroy*, 208 Conn. 392, 545 A.2d 1059 (1988), and *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 398 A.2d 1180 (1978), for the proposition that a medical malpractice claim for solely emotional damages will not lie. Neither case supports that broad conclusion, however. *Maloney*, in which the alleged injuries did not occur in the neonatal context, stood for the proposition that a *bystander* to medical malpractice may not recover for emotional distress. *Maloney* v. *Conroy*, supra, 393, 402. This court recognized the overruling of *Maloney* in *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 570, 574, 113 A.3d 932 (2015). *Montinieri* established the rules for negligent infliction of emotional distress claims and did not address medical malpractice. See *Montinieri* v. *Southern New England Telephone Co.*, supra, 340–46.

Escobar-Santana *v.* State

emotional damages can qualify as a medical malpractice claim for purposes of § 4-160 (f), we look for additional guidance to our state's common law of tort. See, e.g., *Dias* v. *Grady*, supra, 292 Conn. 356 (when text of statute is ambiguous, we may look for interpretive guidance to common-law principles governing same general subject matter); J. Lagnese et al., Connecticut Medical Malpractice: A Manual of Practice and Procedure (5th Ed. 2019) § 1-3, p. 3 (legislature largely codified common law of medical malpractice when it defined "standard of care").

As we explained in *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 113 A.3d 932 (2015), the common law traditionally was loathe to afford recovery for purely emotional injuries. See id., 564. This reflected concerns about "the potential for trivial, frivolous or fraudulent claims," as well as "the difficulties involved in tracing the etiology of psychological harms . . . ." Id.; see also, e.g., 2 Restatement (Third), supra, p. 132 (scope note accompanying chapter 8, §§ 45 through 48).

This hesitation has waned, however, as our understanding of emotional trauma has evolved. See, e.g., *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 565; see also, e.g., *LaBieniec* v. *Baker*, 11 Conn. App. 199, 206, 526 A.2d 1341 (1987) ("medical science has unquestionably become sophisticated enough to provide reliable and accurate evidence on the causes of mental trauma" (emphasis omitted; internal quotation marks omitted)); 2 Restatement (Third), supra, pp. 132–33 (discussing modern trend and courts' increasing openness to allowing recovery for purely emotional harm when traditional reasons given for restricting it do not apply); J. Lagnese et al., supra, § 3-2:3, p. 31 ("[r]ecovery for unintentionally caused emotional distress does not depend on proof of physical injury or risk of physical harm").

347 Conn. 601 AUGUST, 2023 619

Escobar-Santana *v.* State

Accordingly, § 47 of the Restatement (Third) of Torts, Liability for Physical and Emotional Harm, recognizes that courts have begun to permit the imposition of liability for purely emotional distress when, among other things, the defendant's alleged negligence (1) has placed the plaintiff in danger of immediate bodily harm (§ 47 (a)), or (2) "occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm" (§ 47 (b)). 2 Restatement (Third), supra, § 47, p. 175. Among the specific examples given of the types of special relationship injuries envisioned by § 47 (b) are medical malpractice cases in which "a physician negligently diagnoses a patient with a dreaded or serious disease; a physician negligently causes the loss of a fetus; [or] a hospital loses a newborn infant . . . ." Id., § 47, comment (f), pp. 178–79.

Consistent with this modern trend, this court has recognized a cause of action for bystander emotional distress arising out of medical malpractice. See, e.g., *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 568; see also, e.g., 2 Restatement (Third), supra, § 48, pp. 199–200. In addition, the Appellate Court has left open the possibility that a medical malpractice cause of action will lie when a patient suffers purely emotional distress after having been misdiagnosed with a serious illness. See, e.g., *Esposito* v. *Schiff*, 38 Conn. App. 726, 729–30, 662 A.2d 1337 (1995); *LaBieniec* v. *Baker*, supra, 11 Conn. App. 200–201, 205–206; see also, e.g., *Miles* v. *Barajas*, Docket No. NNH-CV-12-6030919-S, 2015 WL 6237934, *3–4 (Conn. Super. September 22, 2015) (relying on *LaBieniec* and allowing medical malpractice action to proceed when plaintiff claimed purely emotional injuries arising from physician's allegedly negligent delay in diagnosing her breast cancer).

Neither this court nor the Appellate Court has spoken to the specific issue of whether a birthing mother can

Escobar-Santana *v.* State

recover for purely emotional injuries suffered as a result of medical negligence causing injury to the fetus or infant during the labor and delivery process. Consistent with the modern trend, however, a number of our sister state courts have concluded, under their common-law authority, that a birthing mother may recover for the purely emotional distress she experiences as a result of medical malpractice resulting in physical injury to or death of her fetus or infant during the labor and delivery process. See, e.g., *Burgess* v. *Superior Court*, 2 Cal. 4th 1064, 1076, 831 P.2d 1197, 9 Cal. Rptr. 2d 615 (1992) ("during pregnancy and delivery it is axiomatic that any treatment for [the fetus] necessarily implicated [the mother's] participation [because] access to [the fetus] could . . . be accomplished [only] with [the mother's] consent and with impact to her body"); *Carey* v. *Lovett*, 132 N.J. 44, 59, 622 A.2d 1279 (1993) ("[T]he physical and emotional ties between mother and fetus so unite them that a physician should anticipate that any malpractice that adversely affects the fetus will cause emotional distress to the mother. . . . In effect, the connection between a mother and her baby so merges direct and indirect claims that the distinction disappears." (Internal quotation marks omitted.)); *Modaber* v. *Kelley*, 232 Va. 60, 66, 348 S.E.2d 233 (1986) ("injury to an unborn child constitutes injury to the mother and . . . she may recover for such physical injury and mental suffering associated with a stillbirth"); see also, e.g., D. Dobbs, "Undertakings and Special Relationships in Claims for Negligent Infliction of Emotional Distress," 50 Ariz. L. Rev. 49, 55 (2008) ("[O]bviously, an obstetrician undertakes to care for both [the] mother and [the] unborn child. His negligent delivery of the child that . . . harms the child violates his duty to the child and also to the mother. Consequently, he is liable to the mother for her emotional distress . . . ."). But see, e.g., *Prado* v. *Catholic Medi-*

Escobar-Santana *v.* State

*cal Center of Brooklyn & Queens, Inc.*, 145 App. Div. 2d 614, 615, 536 N.Y.S.2d 474 (1988) ("[in the absence of] independent physical injuries [beyond those naturally associated with the childbirth process], a mother may not recover for emotional and psychic harm as a result of a stillbirth").

Most of these courts have adopted this rule on the theory that the mother and fetus are physically and emotionally inseparable prior to birth, and, therefore, a physical injury to the child during the birthing process is, in effect, a bodily injury to the mother as well. The mother and the child are, in effect, joint victims of the medical malpractice. Courts allowing recovery of such damages also have recognized the unique expectancies that attend the birthing process. See, e.g., *Burgess* v. *Superior Court*, supra, 2 Cal. 4th 1076 ("[t]he birth of a child is a miraculous occasion which is almost always eagerly anticipated and which is invested with hopes, dreams, anxiety, and fears").

Some courts also have adopted the rule on public policy grounds. See, e.g., *Tanner* v. *Hartog*, 696 So. 2d 705, 708 (Fla. 1997) ("it is difficult to justify the outright denial of a claim for the mental pain and anguish which is so likely to be experienced . . . as a result of the birth of a stillborn child caused by the negligence of another"). Still others have permitted the mother to recover under the so-called "impact" or "zone of danger" rules. See, e.g., *Vaillancourt* v. *Medical Center Hospital of Vermont, Inc.*, 139 Vt. 138, 143, 425 A.2d 92 (1980). In any event, we are persuaded that a majority of the state courts to have considered the question have concluded that emotional distress damages resulting from an injury to a fetus or infant during the birthing process are recoverable by the mother.[14] See, e.g., *Smith* v.

_____

[14] At the same time, many of those courts have sought to cabin the potential liability arising from this rule, for reasons of law or public policy. Although "[t]he demarcation lines drawn by the courts are not always consistent and . . . are not always clearly articulated"; *Smith* v. *Borello*, 370 Md. 227, 241,

Escobar-Santana *v.* State

*Borello*, 370 Md. 227, 241, 246, 804 A.2d 1151 (2002); *Fehely* v. *Senders*, 170 Or. 457, 460, 135 P.2d 283 (1943).

This is also the prevailing view among the judges of the Superior Court. As one court explained, "[n]umerous Superior Court [judges] have considered whether a mother may recover emotional distress damages for the injury or death of a child resulting from medical malpractice in the prenatal and delivery periods. . . . The majority of the Superior Court [judges who] have considered the issue have ruled that a mother is not a bystander [with respect to matters] that are incident to prenatal care and the delivery of her child. . . . The very term delivery presupposes that the mother is an active participant in the birthing of a child. To hold otherwise would be to reject the entire human experience, everywhere and at all times. . . . [W]hen a child is injured due to negligent obstetrical care, the mother and child are joint victims of malpractice, not separable entities." (Internal quotation marks omitted.) *Leoma* v. *OB-GYN Services, P.C.*, Docket No. KNL-CV-11-6011571-S, 2012 WL 4040464, *2 (Conn. Super. August 28, 2012); see also, e.g., *Gambacorta* v. *Williams*, Docket No. HHD-CV-17-6077609-S, 2021 WL 402053, *3 (Conn. Super. January 8, 2021) ("the majority of the judges of the Superior Court who have considered the . . . issue [have] concluded that obstetricians owe a duty to the mother to exercise reasonable care in the treatment of her child and are answerable in damages

804 A.2d 1151 (2002); courts generally have limited the emotional distress damages that the mother can recover to those arising from the traumas she suffered during and immediately following the birthing process, up to and including her realization of her child's injuries; emotional distress damages for ongoing emotional distress arising from a loss of the child's consortium, coping with the child's ongoing injuries or with the ongoing loss of the child, or disruptions to the ordinary routines of life generally have been permitted only when authorized by statute. See, e.g., id., 241, 244, 247–48; see also, e.g., *Burgess* v. *Superior Court*, supra, 2 Cal. 4th 1084; *Mehigan* v. *Sheehan*, 94 N.H. 274, 278, 51 A.2d 632 (1947); *Modaber* v. *Kelley*, supra, 232 Va. 66–67.

Escobar-Santana *v.* State

for the emotional distress suffered by the mother there-from'' (emphasis omitted)); J. Lagnese et al., supra, § 3-2:3.1, p. 34 (observing that this is probably majority position in Connecticut).[15]

In *Gambacorta*, for example, the court, following § 47 (b) of the Restatement (Third) of Torts, Liability for Physical and Emotional Harm, adopted what it took to be the majority view. See *Gambacorta* v. *Williams*, supra, 2021 WL 402053, *3, *5. The court concluded that holding a physician liable for such eminently foresee-able damages is consonant with the ''preexisting physi-cian-patient relationship between both mother and child''; id., *5; comports with the normal expectations of the mother; id.; and, from a public policy standpoint, does not unduly ''enlarge the common law [by extending] the duty of health care providers to nonpatients.'' Id., *3.

3

We cannot know whether the legislature had this body of common law and these modern trends in mind when it enacted § 4-160 (f). In the absence of any clear legislative statement to the contrary, however, it remains the proper role of this court to define the scope and nature of a medical malpractice action. See, e.g., *In re Ava W.*, 336 Conn. 545, 579, 248 A.3d 675 (2020) (''[Although] the legislature's authority to abrogate the common law is undeniable, we will not lightly impute such an intent to the legislature. . . . In determining whether . . . a statute abrogates or modifies a [com-mon-law] rule the construction must be strict, and the

_____

[15] Because the state was not the defendant and the sovereign immunity statute was not at issue, the courts in these cases generally did not have cause to distinguish between medical malpractice and related causes of action, such as negligent infliction of emotional distress. Thus, although some of them determined that the allegations qualified as negligent infliction of emotional distress, they provide little support for the state's position that the plaintiffs' claims in the present case do not also sound in medical malpractice. See part II C of this opinion.

operation of a statute in derogation of the common law
is to be limited to matters clearly brought within its scope.''
(Internal quotation marks omitted.)); *Greenwald* v. *Van
Handel*, 311 Conn. 370, 383, 88 A.3d 467 (2014) (''although
procedurally circumscribed by statute, medical malprac-
tice claims are [still] brought pursuant to the common
law''); *Neuhaus* v. *DeCholnoky*, 280 Conn. 190, 221, 905
A.2d 1135 (2006) (explaining that, notwithstanding restric-
tions on medical malpractice actions adopted during
tort reform process, ''our courts routinely examine
whether to extend a duty to a particular defendant . . .
in light of the policy considerations at play in the case'').

Accordingly, we agree with the majority position and
hold, under our common-law authority, that a birthing
mother may recover for emotional distress arising from
her traumatic experiences during and immediately fol-
lowing the birthing process, up to and including her
realization of her child's injuries, when those injuries
are proximately caused by the defendant's medical mal-
practice while the child was in utero. Insofar as § 4-160
(f) incorporates Connecticut's common law of tort, we
interpret the term ''medical malpractice claims'' in
that light.

C

With these principles in mind, we return our attention
to the present case. As we explained in part II B of this
opinion, a birthing mother who alleges that she suffered
emotional distress as a result of medical malpractice
during the labor and delivery process is not limited in
her recovery to damages arising from her own physical
injuries. She also may recover for emotional distress
arising from her awareness of the damage wrought by
the malpractice on the child. To the extent that Escobar-
Santana is claiming purely emotional damages arising
from such injuries, then, she is not precluded from

Escobar-Santana *v.* State

bringing a medical malpractice claim against the state on that basis.

The final question is whether count two of the complaint does in fact state a medical malpractice claim within the terms just described. The state argues that count two must be dismissed because Escobar-Santana's claim sounds either in negligent infliction of emotional distress or in bystander emotional distress, rather than medical malpractice. Neither of those causes of action has the same essential elements as a medical malpractice claim, the state contends, and, therefore, they are not encompassed by the legislative waiver of sovereign immunity for medical malpractice actions in § 4-160 (f).

The state is correct that, even in the health care context, both negligent infliction of emotional distress and bystander emotional distress are causes of action distinct from medical malpractice.[16] The state also is correct that the waiver of sovereign immunity in § 4-160 (f), which is limited to medical malpractice actions, does not extend to such claims. Insofar as certain paragraphs of the complaint or portions thereof can be

---

[16] To prove bystander emotional distress, the plaintiff must establish that "(1) the bystander is closely related to the primary victim of the accident or injury, (2) the bystander's emotional distress is caused by the contemporaneous sensory perception of the event or conduct that causes the accident or injury, or by arriving on the scene soon thereafter and before substantial change has occurred in the primary victim's condition or location, (3) the primary victim dies or sustains serious physical injury, and (4) the bystander experiences serious emotional distress as a result." *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 582. None of those elements is an essential element of a medical malpractice claim. Similarly, to prove negligent infliction of emotional distress, the plaintiff must specifically establish that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978); see also *Wood* v. *Rutherford*, 187 Conn. App. 61, 79–80, 201 A.3d 1025 (2019) (applying similar standard in health care context).

Escobar-Santana *v.* State

read to allege such causes of action exclusively, the elimination of those portions of the complaint could have been accomplished by a request to revise. See Practice Book § 10-35; see also footnote 6 of this opinion.

The state is incorrect, however, that count two of the complaint cannot also be read to allege a medical malpractice claim on behalf of Escobar-Santana. "Under modern pleading practice, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Williams* v. *Housing Authority*, 327 Conn. 338, 372, 174 A.3d 137 (2017). Moreover, "[i]n ruling on a motion to dismiss for lack of subject matter jurisdiction, the trial court must consider the allegations of the complaint in their most favorable light . . . including those facts necessarily implied from the allegations . . . ." (Internal quotation marks omitted.) *Giannoni* v. *Commissioner of Transportation*, 322 Conn. 344, 349, 141 A.3d 784 (2016).

In borderline cases, we have indicated that, to ascertain whether a claim qualifies as a medical malpractice claim, we ask the following three questions: (1) are the defendants being "sued in their capacities as medical professionals," (2) is the alleged negligence "of a specialized medical nature that arises out of the medical professional-patient relationship," and (3) is the alleged negligence "substantially related to medical diagnosis or treatment" and does it "[involve] the exercise of medical judgment?" (Internal quotation marks omitted.) *Doe* v. *Cochran*, 332 Conn. 325, 335, 210 A.3d 469 (2019). In the case of Escobar-Santana's claim, the answer to all three questions is clearly yes.

Count two of the complaint incorporates by reference paragraphs 1 through 13 of count one, which undisputedly make out a medical malpractice claim. The con-

Escobar-Santana *v.* State

tention is that the state, via a state hospital and two of its physicians, among other professional staff, undertook to provide pregnancy, labor, and delivery services for Escobar-Santana after having admitted her as a patient. All of the allegations of negligence arise out of that physician-patient relationship. The allegations all involve the breach of the standard of care by the hospital staff while operating in their professional medical capacities: things like misdiagnosing the nature of the pregnancy, misassessing the risks of labor and delivery, failing to use proper imaging techniques and to consider input from other medical specialists, failing to recommend the correct delivery method, failing to use proper delivery technique, failing to properly care for Escobar-Santana during labor and delivery, and failing to maintain appropriate medical records, staffing, and treatment protocols.

In addition, count two purports to be brought pursuant to § 4-160. The plaintiffs attached to the complaint a good faith certificate, compliant with § 52-190a (a), certifying that there are grounds for a good faith belief that there had been negligence in the care and treatment of Escobar-Santana. They included a copy of a physician's letter addressing the question of "whether the standard of care on the part of board-certified obstetricians and obstetrics and gynecology residents was breached in the prenatal and intrapartum care of . . . Escobar-Santana . . . ." In the letter, the plaintiffs' expert ultimately concluded that the state breached the standard of care by, among other things, not informing Escobar-Santana of the risks associated with vaginal delivery and counseling her regarding her delivery options prior to labor induction, as well as failing to use proper delivery technique. The fact that expert testimony likely will be required to establish the state's liability also counsels in favor of construing count two

Escobar-Santana *v.* State

as one for medical malpractice. See *Shortell* v. *Cavanagh*, 300 Conn. 383, 388, 393, 15 A.3d 1042 (2011).

In light of these allegations, and consistent with our obligation to construe the pleadings in the light most favorable to the plaintiffs, we understand Escobar-Santana's allegation that she suffered a "traumatic, terrifying and painful" delivery, followed by "severe psychological, physiological and emotional distress," as inextricably connected to her allegations of medical malpractice. We thus conclude that the trial court properly denied the state's motion to dismiss the second count of the plaintiffs' complaint.

The decision of the trial court is affirmed.

In this opinion the other justices concurred.

ROBINSON, C. J., concurring. I agree with the majority's conclusion that, for purposes of General Statutes § 4-160 (f),[1] the plaintiffs, Celine Escobar-Santana (Escobar-Santana) and her infant son, Emmett Escobar-Santana, have pleaded a colorable medical malpractice claim with respect to count two of their complaint. As the majority aptly concludes, § 4-160 (f) waives sovereign immunity for " 'medical malpractice claims only' " and affords a mechanism by which plaintiffs can bypass the Claims Commissioner upon the filing of a timely medical malpractice action in the Superior Court. Part II B of the majority opinion. Given our mandate to construe pleadings broadly; see, e.g., *Carpenter* v. *Daar*, 346 Conn. 80, 127, 287 A.3d 1027 (2023); and the legislative purpose of § 4-160 (f) as explained by the majority; see part II B 1 and 2 of the majority opinion; I agree with the majority's conclusion that count two can be read to allege a medical malpractice claim by Escobar-Santana for purposes of the sovereign immunity waiver provided by that statute. Not only does count two sound in medical malpractice, but the plaintiffs also attached a good faith certificate and opinion letter that alleged

_____

[1] See footnote 1 of the majority opinion.

that the defendant, the state of Connecticut, had breached the standard of care during the labor and delivery process. See General Statutes § 52-190a (a). Given the common-law trend of recognizing emotional distress damages in medical malpractice actions, I agree with the majority's conclusion that, to the extent that Escobar-Santana alleged only damages caused by emotional distress, in the absence of her own physical injury, she is not precluded from bypassing the Claims Commissioner under § 4-160 (f).

I write separately, however, to emphasize that the dispositive issue in this case is limited to whether there has been a waiver of sovereign immunity for purposes of § 4-160 (f) as a matter of construction of that statute, thus affording the trial court subject matter jurisdiction over the claims pleaded in count two of the plaintiffs' complaint. Because, as was highlighted at oral argument before this court, the state assumes for purposes of this motion to dismiss that there was a duty of care owed to Escobar-Santana, I, too, assume that such duty existed given the procedural posture of this case. Given that assumption, I leave to another day a comprehensive examination of whether there was, in fact, a duty of care owed to Escobar-Santana and whether she ultimately will prevail on her emotional distress claim.

Accordingly, I join the majority opinion affirming the decision of the trial court to deny the state's motion to dismiss count two of the complaint.